**The PEOPLE of the State of California, acting By and Through the CALIFORNIA DEPARTMENT OF TRANSPORTATION, Plaintiffs,**

v.

**CITY OF SOUTH LAKE TAHOE, a California Municipal Corporation, and the Tahoe Regional Planning Agency, Defendants.**

**Civ. No. S–78–435 PCW.**

United States District Court,
E. D. California.

Dec. 22, 1978.

**530**

Harry S. Fenton, Chief Counsel, Sacramento, Cal., Norval Fairman, San Francisco, Cal., Joseph C. Easley, Sacramento, Cal., Robert R. Buell, San Francisco, Cal., George L. Cory, Sacramento, Cal., for plaintiff People by and through the State Dept. of Transp.

Gary A. Owen, Owen & Rollston, Zephyr Cove, Nev., for defendant Tahoe Regional Planning Agency.

Roy C. Abrams, City Atty., City of South Lake Tahoe, South Lake Tahoe, Cal., for defendant City of South Lake Tahoe.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

Plaintiff, the People of the State of California acting through the California Department of Transportation, filed this action requesting injunctive and declaratory relief. The complaint sought to prevent defendants, the City of South Lake Tahoe (City) and the Tahoe Regional Planning Agency (TRPA) from constructing the California segments of the so-called "loop road project" at the south end of Lake Tahoe without first complying with certain allegedly applicable state and federal laws. This matter comes before us now on plaintiff's motion for a preliminary injunction and on defendants' motions to dismiss the complaint and/or for summary judgment.

## I. BACKGROUND

The Lake Tahoe basin comprises a 500 square mile area of spectacular beauty located in the Sierra Nevada Mountains along the California-Nevada border. Mark Twain described his first view of the lake, with its still reflection of the surrounding snow-capped peaks, as "surely . . . the fairest picture the whole earth affords." M. Twain, *Roughing It* 156 (Harper & Rowe 1899). The lake is 22 miles long and 12 miles wide with a maximum depth of 1,645 feet and a natural surface elevation of 6,223 feet above sea level. It is famed for the clarity and the brilliant blue-green color of its waters. Only two other sizable lakes in the world are of comparable quality—Crater Lake in Oregon, which is protected as part of the Crater Lake National Park, and Lake Baikal in the Soviet Union. H.R.Rep. No.650, 91st Cong., 1st Sess. 2–3 (1969); S.Rep.No.510, 91st Cong., 1st Sess. 4 (1969).

The rapid population growth in the western part of the United States, the postwar boom in tourism, outdoor recreation, and gambling, and the advent of modern all-weather highways bringing Lake Tahoe within a few hours drive from several major metropolitan areas resulted in explosive growth and development in the basin and along the shoreline. These factors have posed a severe threat to the ecology of the area.[1] Recognizing that local regulation

---

1. The problems resulting from the rapid population growth and accompanying development were described in congressional committee reports as follows:

Not only the scenic beauty of the region but the very quality of its natural environment are now at stake. Ominous signs of water pollution are becoming all too evident. The native Lahontan cutthroat trout no longer survive in Lake Tahoe because of man-caused changes in the habitat. Tree removal, excavations, highway construction, landfill, and other development activities have scarred the basin slopes and triggered destructive erosion. Outdoor recreation facilities, meanwhile, have not kept pace with the expanding public demands and accepted projections are for that demand to increase by five times in the period between 1960 and 1980. Fortunately, Federal and private land ownership patterns have served to maintain much of Lake Tahoe's natural shoreline quality, particularly the eastern shore. However, pressures are mounting to develop these areas.

was inadequate to preserve the natural resources of the area and that comprehensive regional planning was needed,[2] California and Nevada entered into the Tahoe Regional Planning Compact (Compact), approved by Congress in 1969.[3] Cal. Gov't Code §§ 66800–66801 (West Supp.1978); Nev. Rev.Stat. §§ 277.190–.220 (1977); Pub.L.No. 91–148, 83 Stat. 360, *reprinted in* [1969] U.S.Code Cong. & Admin.News, p. 380. The Compact created a bi-state organization, TRPA,[4] and charged it with adopting ordinances, rules, regulations, and policies to effectuate a regional plan for the area. The Compact specified that the regional plan must include a transportation plan for the integrated development of a regional system of transportation. Compact, Article V(b)(2). Accordingly, in 1975 TRPA adopted a transportation plan, which included a proposed loop road at the southern end of Lake Tahoe to consist of a newly constructed road around the existing casino area in Douglas County, Nevada, which would connect with existing and extended streets in the City of South Lake Tahoe, California. Douglas County and the City agreed to build the portions of the loop road falling within their respective jurisdictions.

In May 1978, after TRPA had approved the Nevada portion of the loop road project[5] but before construction of that portion had begun, plaintiff herein filed an action in the United States District Court for the District of Nevada to enjoin the proposed Nevada construction and seeking certain declaratory relief. Plaintiff's motion for a temporary restraining order in that case was denied, and its motion for a preliminary injunction is still pending before the district court. *People of the State of California Acting By and Through the California Department of Transportation v. County of Douglas,* No. 78–84 (D.Nev., filed May 8, 1978). An appeal from the order denying the temporary restraining order is presently before the United States Court of Appeals for the Ninth Circuit. *Id., appeal docketed,* No. 78–2106 (9th Cir., May 19, 1978). In the meantime, the Nevada construction proceeded and was opened to traffic on August 11, 1978.

On August 18, 1978, plaintiff filed this action to enjoin construction of the California portion of the loop road project, which would consist of widening, realigning, or extending certain segments of existing City

H.R.Rep.No.650, 91 Cong., 1st Sess. 4 (1969); S.Rep.No.510, 91st Cong., 1st Sess. 5 (1969). *See also* Ayer, *Water Quality Control at Lake Tahoe: Dissertation on Grasshopper Soup,* 1 Ecology L.Q. 3 (1971).

2. Responsibility for controlling development in the basin was fragmented among five counties, two municipalities, and a variety of federal and state agencies with varying degrees of authority, thus preventing a unified and organized approach to the mounting problems. *See* H.R. Rep.No.650, 91st Cong., 1st Sess. 4 (1969); S.Rep.No.510, 91st Cong., 1st Sess. 5 (1969). Moreover, since the local economy is dependent on tourist-related industry, local governments were disinclined to enact strict developmental controls to protect the basin's resources from overuse. For a discussion of the tension between the local interests favoring development and the regional goal of preserving the area, *see* Note, *Regional Government for Lake Tahoe,* 22 Hastings L.J. 705 (1971).

3. Congressional approval of interstate compacts is required by the United States Constitution, art. I, § 10, cl. 3, which provides: "No

State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State . . . ."

4. As originally proposed, the bi-state agency was to have had a governing board of fifteen members, only six of whom would have represented local governmental entities. The legislation that was ultimately enacted decreased the total voting membership to ten, thus giving the local entities control of the governing body. Other changes also weakened the power of the bi-state agency from that originally proposed. *See generally* Note, Regional Government for Lake Tahoe, 22 Hastings L.J. 705, 708–15 (1971); Ayer, *Water Quality Control at Lake Tahoe: Dissertation on Grasshopper Soup,* 1 Ecology L.Q. 3, 53–55 (1971).

5. Article VI(c) of the Compact provides that all public works projects, other than those initiated and to be constructed by an executive or administrative agency of the state of California or Nevada, must be reviewed prior to construction and approved by TRPA as to the project's compliance with the adopted regional general plan.

streets.[6] Plaintiff also sought declarations that TRPA is subject to the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347 (1976), and the California Environmental Quality Act (CEQA), Cal.Pub.Res.Code §§ 21000–21176 (West 1977). In addition, plaintiff prayed for declarations that the City, in undertaking the improvements to the California portion of the loop road, is subject to the approval provisions of the California Tahoe Regional Planning Agency (CTRPA)[7] and to the provisions of CEQA.

On August 22, 1978, this court denied plaintiff's motion for a temporary restraining order. On August 23, 1978, the City received approval from TRPA to undertake construction of one of the segments of the California loop road project, the realignment and widening of an access road connecting the westerly portion of the Nevada loop road to Pine Boulevard. On the same date, however, the Superior Court of the State of California for the County of El Dorado, in a wholly separate action, issued a temporary restraining order prohibiting that construction based on the City's failure to obtain CTRPA approval. The Superior Court subsequently lifted the restriction, *California Tahoe Regional Planning Agency v. City of South Lake Tahoe*, No. 31911 (Super.Ct. El Dorado, Oct. 6, 1978), and the

Pine Boulevard construction has now been substantially completed.

## II. THE RIGHT OF THE DEPARTMENT OF TRANSPORTATION TO SUE ON BEHALF OF THE PEOPLE OF CALIFORNIA

We face at the outset defendant City's claim, raised in its Points and Authorities in opposition to plaintiff's complaint, that the California Attorney General has the exclusive right to bring environmental actions in the name of the people of California and that the Department of Transportation therefore improperly seeks to allege the rights of persons it cannot represent.[8]

The California Attorney General has charge of all legal matters in which the state is interested except those of state agencies which are authorized by statute to employ attorneys. Cal. Gov't Code §§ 11041 (West Supp.1978), 11402 (West 1966), 12511 (West 1963). The Department of Transportation has statutory authority to maintain a legal department, *see id.* §§ 11041, 14007 (West Supp.1978); Cal.Sts. & Hy.Code § 20 (West Supp.1978), and it may bring legal actions in the name of the state in matters relating to the construction, improvement, maintenance, or use of

---

**6.** The proposed improvements to the California portion of the loop road included the following: (1) widening and realigning an access road which was approximately 260 feet long and 20 feet wide and which connected the westerly end of the Nevada loop road with the intersection of Pine Boulevard and Stateline Avenue; (2) extending Montreal Road by approximately 500 feet (over land part of which is owned by plaintiff) to connect with the easterly end of the Nevada loop road; and (3) realigning Park Avenue in the vicinity of Raley's Shopping Center.

**7.** The California legislature created CTRPA in 1967 at the same time that it adopted the TRPA legislation. As originally proposed, CTRPA was to have been an interim agency with the power to deal with regional problems only until the bi-state agency came into existence, *see generally* Note, *Regional Governmental for Lake Tahoe*, 22 Hastings L.J. 705, 710–11 (1971), but CTRPA as enacted was authorized to continue until its enacting legislation is repealed, Cal. Gov't Code § 67130 (West Supp. 1978).

CTRPA was directed to adopt a comprehensive long-term general plan including a transportation plan, for the development of the portion of the basin within California. *Id.* § 67070. The transportation plan adopted by CTRPA did not include the loop road project because of CTRPA's desire to deemphasize use of the automobile in the basin. CTRPA also maintained the power to approve or disapprove proposed public works projects before they can be submitted to TRPA for approval. *Id.* § 67103.1.

The City obtained approval from TRPA on August 23, 1978, to undertake the proposed improvements to the Pine Boulevard access road without first submitting the proposal to CTRPA.

**8.** Defendant City apparently concedes that the California Department of Transportation might have standing to bring an action on its own behalf by virtue of its ownership of real property which is located directly in the path of the proposed extension of Montreal Road.

highways under its jurisdiction. *See* Cal. Sts. & Hy.Code § 92 (West 1969). Since the proposed California loop road improvements could impact the portion of Route 50 within California,[9] over which the Department of Transportation has jurisdiction, *see id.* §§ 20 (West Supp.1978), 90 (West 1969), 253.1 (West Supp.1978), the present action is within the authority of that agency.

Defendant City contends, however, that the California Attorney General has the exclusive right to represent the people of California in environmental actions by virtue of Government Code sections 12600–12612, enacted in 1971, which grant broad environmental protection authority to the Attorney General. Defendant particularly points to section 12600(b), which provides: "It is in the public interest to provide the people of the State of California through the Attorney General with adequate remedy to protect the natural resources of the State of California from pollution, impairment, or destruction."

█ Defendant misconstrues the significance of this legislation, for it was intended to ensure that the Attorney General would have the right—but not necessarily the exclusive right—to bring environmental actions on behalf of the people of the state where appropriate. *See generally* Wagoner, *Environmental Protection in California: Court Action Powers of State and Local Government Attorneys,* 14 Santa Clara Law. 296 (1974). That the legislation was intended to be permissive rather than restrictive is apparent from the language of the statute. Section 12607 states: "The Attorney General *may* maintain an action for equitable relief in the name of the people of the State of California against any person for the protection of the natural

resources of the state from pollution, impairment, or destruction." (Emphasis added.) Section 12603 states: "This article shall be liberally construed and applied to promote its underlying purposes," which are defined elsewhere as the protection of the environment and the natural resources of the state. Cal. Gov't Code § 12600 (West Supp.1978). Defendant's restrictive construction of the statute is not consistent with this mandate, nor is it consistent with section 12601, which provides: "The provisions of this article are not exclusive, and the remedies provided for in this article shall be in addition to any other remedies provided for in any other law or available under common law."

Accordingly, we hold that the California Department of Transportation has the right to maintain this action in the name of the people of California.[10]

## III. DEFENDANTS' MOTIONS TO DISMISS

Defendants have filed motions to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.

### A. *Subject Matter Jurisdiction*

█ Plaintiff predicates subject matter jurisdiction on 28 U.S.C. § 1331(a). For an action to fall within that provision, "a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Gully v. First Nat'l Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936). The Ninth Circuit has held that the construction of an interstate compact which requires a judicial determination of

---

**9.** Route 50 is the main thoroughfare serving the South Lake Tahoe area. It bisects both the Nevada loop road and Park Avenue, an existing City street which forms the southern portion of the proposed California loop road.

**10.** Maintenance of this action is especially appropriate because the portion of Route 50 from Route 49 near Placerville, California, to the Nevada state line is included in the state scenic highway system. Cal.Sts. & Hy.Code § 263.4

(West Supp.1978). In designating certain portions of the state highway system as scenic highways, the California legislature intended "to establish the State's responsibility for the protection and enhancement of California's natural scenic beauty by identifying those portions of the state highway system which, together with the adjacent scenic corridors, *require special scenic conservation treatment.*" *Id.* § 260 (West 1969) (emphasis added).

the nature and scope of the obligations set forth therein forms an essential element of the complaint and arises under the "laws" of the United States within the meaning of section 1331(a). *League to Save Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517, 519–22 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); *accord, League to Save Lake Tahoe v. B. J. K. Corp.,* 547 F.2d 1071 at 1072, 1073–74 (9th Cir. 1976). *See also* Comment, *Federal Question Jurisdiction to Interpret Interstate Compacts,* 64 Geo.L.J. 87 (1975). Accordingly, since the present action involves the construction of the Compact in order to determine whether TRPA is subject of NEPA or CEQA and whether the City must comply with the approval provisions of CTRPA, we hold that this court has jurisdiction under 28 U.S.C. § 1331(a).

### B. *Failure to State a Claim*

Defendants also assert that plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted. The test most often applied to determine the sufficiency of the complaint was set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), in which the Supreme Court stated: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

Plaintiff asserts that TRPA approved construction of the Pine Boulevard improvements without first complying with the procedural requirements of either NEPA or CEQA and that the City in processing the loop road project for construction has not complied with the approval provisions of CTRPA or with CEQA. TRPA responds that it is not subject to either NEPA or CEQA. The City denies the validity of the CTRPA approval provisions. While it does not expressly deny that it is subject to CEQA, it appears to argue that the CEQA requirements have been met as to the loop road and that the Pine Boulevard improvement falls within a categorical exemption to CEQA because it is designed to remedy existing safety problems rather than to facilitate the loop road.

Thus if either NEPA or CEQA does apply to TRPA, TRPA's grounds for dismissal are unavailing. Similarly, if the CTRPA approval provisions apply to the loop road, or if CEQA applies to the City the City's grounds for dismissal are likewise unavailing.

1. *The Applicability of NEPA to TRPA.* Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1976), requires all "agencies of the Federal Government" to the fullest extent possible to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" an environmental impact report (EIR) analyzing the consequences of, and alternatives to, the proposed action. A threshold question is thus whether TRPA is a federal agency within the meaning of this provision. This is a matter of first impression, and to determine the guiding principles we must analyze the other cases involving the implications of congressional consent to interstate compacts.

The Supreme Court has long held that the construction of an interstate compact presents a federal question for the purpose of certiorari review of judgments of the highest state court under 28 U.S.C. § 1257(3).[11] *Delaware River Joint Toll Bridge Comm'n v. Colburn,* 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940); *Dyer v. Sims,* 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951). This position was based on the conclusion in *Colburn* that

11. This section provides in relevant part:

Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:

. . . . .

(3) By writ of certiorari, . . . where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes of, or commission held or authority exercised under, the United States.

the construction of such a [bi-state] compact sanctioned by Congress by virtue of Article I, § 10, Clause 3 of the Constitution, involves a federal "title, right, privilege, or immunity" which when "specially set up or claimed" in a state court may be reviewed here on certiorari under [the predecessor of 28 U.S.C. § 1257(3)]

. . . . .

310 U.S. at 427, 60 S.Ct. at 1041, *cited with approval in Dyer v. Sims,* 341 U.S. 22, 26, 71 S.Ct. 557, 95 L.Ed. 713 (1951).

■ While the Supreme Court did not clearly articulate the rationale for its conclusion in *Colburn,* the decision appears to have been based on the "law of the Union" doctrine [12]—*i. e.,* on the theory that congressional consent transforms an interstate compact into a federal law.[13] The Ninth Circuit's holding in *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517, 519–22 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975), that construction of an interstate compact presents a federal question was based on this interpretation of *Colburn.* The Ninth Circuit has emphasized, however, that its holding was also supported by a strong policy favoring access to the federal courts where conflicts develop over the interpretation of interstate compacts. *Id.* at 522–24; *League to Save Lake Tahoe v. B. J. K. Corp.,* 547 F.2d 1072, 1074–75 (9th Cir. 1976). *See generally* Comment, *Federal Question Jurisdiction to Interpret Interstate Compacts,* 64 Geo.L.J. 87, 107–11 (1975).

As a logical implication of the law of the Union doctrine, plaintiff argues that TRPA, in administering the Compact, is a federal agency and is therefore subject to the provisions of NEPA. While such an interpretation is not inconsistent with *Colburn,* plaintiff has failed to cite a single modern case not involving a jurisdictional question in which courts have applied the law of the Union doctrine to interstate compacts. The Ninth Circuit impliedly declined to apply the doctrine in *Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353 (9th Cir. 1977), *cert. granted,* 436 U.S. 943, 56 L.Ed.2d 784, 98 S.Ct. 2843 (1978), in which it held that landowners could not sue the United States although they had allegedly been deprived of the beneficial use of their property as a result of down-zoning mandated by a TRPA ordinance. The court stated: "We agree with the district court that the approval of the Compact by Congress and the limited appointment power of the President [to appoint a single non-voting representative to the governing body pursuant to Article VIII(d)(3) of the Compact] do not thereby establish the TRPA as an agency of the United States." *Id.* at 1362–63.

*Jacobson* reflects the strong policy reasons for not implicating the federal government in the operation of interstate compacts merely because of the constitutional requirement of congressional consent to such compacts. Indeed, giving the law of the Union doctrine expansive application would as a practical matter spell the death

**12.** This term has its genesis in *Pennsylvania v. Wheeling & Belmont Bridge Co.,* 54 U.S. 518, 564, 14 L.Ed. 518 (1851), which involved an action by Pennsylvania to abate a bridge constructed across the Ohio River at Wheeling, Virginia, on the ground that it obstructed navigation to and from Pennsylvania ports. The construction of the bridge had been authorized and approved by Virginia. Since state law had not been violated, Pennsylvania had to show a violation of federal law to prevail. The Court concluded that the Virginia-Kentucky Compact of 1789, in which the signatory states had agreed that there would be free navigation of the Ohio River, "by the sanction of Congress, has become a *law of the Union.*" *Id.* at 566 (emphasis added). Since the bridge therefore

contravened a federal law, the Court rendered judgment for Pennsylvania.

**13.** *See* Engdahl, *Construction of Interstate Compacts: A Questionable Federal Question,* 51 Va.L.Rev. 987 (1965). Alternative interpretations of *Colburn* include the theory that construction of an interstate compact involves a right claimed under the Constitution or a United States treaty, *see id.* at 1029–37, or that it was based on the application of federal common law to the construction of the compact in question, *see League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517, 521 n.8 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975).

knell for interstate compacts, since states would understandably be reluctant to enter into agreements to solve regional problems if by doing so they would subject themselves to a host of federal regulations.[14] Thus we reject plaintiff's argument that, by virtue of the law of the Union doctrine, TRPA is a federal agency within the meaning of NEPA.

Plaintiff also contends that TRPA is subject to NEPA by virtue of section 102(1), 42 U.S.C. § 4332(1) (1976), which states that, to the fullest extent possible, "the policies, regulations, and *public laws of the United States* shall be interpreted and administered in accordance with the policies set forth" in NEPA. (Emphasis added.) Plaintiff cites *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 507 F.2d 517 (9th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975) for the proposition that the Compact is a federal public law and concludes from this that TRPA must therefore administer the Compact in accordance with NEPA pursuant to section 102(1).

Plaintiff misconstrues the purpose of section 102(1), for it was intended to ensure that federal agencies subject to NEPA by virtue of section 102(2) would interpret the NEPA provisions as a supplement to their existing authority and as a mandate to view traditional policies in light of NEPA's national environmental objectives. The phrase "to the fullest extent possible" was intended to make clear that federal agencies must comply with NEPA's requirements unless the law applicable to those agencies expressly prohibits or makes compliance impossible. H.R.Rep.No.91–765, 91st Cong., 1st Sess. 9, *reprinted in* [1969] U.S.Code Cong. & Admin.News, pp. 2767,

2770. Thus we reject plaintiff's contention that section 102(1) is relevant to the present issue, and for the foregoing reasons we hold that TRPA is not subject to the provisions of NEPA.

2. *The Applicability of CEQA to TRPA.* Next we address plaintiff's argument that TRPA is subject to the provisions of CEQA, Cal.Pub.Res.Code §§ 21000–21176 (West 1977). This in turn requires two separate determinations—whether TRPA is a "public agency" within the meaning of CEQA and, if so, whether the application of CEQA to TRPA would be consistent with the Compact.

CEQA was enacted by the California legislature in 1970, a year after its federal counterpart, NEPA, was promulgated. The legislative purpose of CEQA was to ensure that environmental consideration would play a significant role in governmental decision-making. *Id.* §§ 21000–21001. To this end, all "public agencies" must adopt guidelines and procedures for the evaluation of discretionary (as opposed to ministerial or emergency) projects and for the preparation of EIRs, *id.* §§ 21080 (West Supp.1978), 21082 (West 1977), and all "state agencies" and "local agencies" must prepare and certify the completion of an EIR on any projects they propose to carry out or approve which may have a significant effect on the environment, *id.* §§ 21100, 21151. Since the term "local agency" is defined as "any public agency other than a state agency, board or commission," *id.* § 21062, whether the CEQA provisions encompass an agency created by an interstate compact to which California is a party depends first on whether such an agency is a "public agency" within the meaning of the CEQA provisions.[15]

14. An able commentator has concluded that the law of the Union doctrine is unfortunate in its implications for future litigation and therefore should be discarded so that

the way will be open for creative legal analysis to characterize the interstate compact in a manner which not only will support certiorari, if that is desired, but also will make possible the development of other aspects of compact law in such fashion as to maximize the

potential of the compact device as an instrument of American government.

Engdahl, *Construction of Interstate Compacts: A Questionable Federal Question*, 51 Va.L.Rev. 987, 1048–49 (1965).

15. *See* J. Longtin, California Land Use Regulations 366 (1977), which concludes that "[a]ny technical distinction in the above terms ['public agency' on the one hand and 'state agency' or

■ The term "public agency" is defined to include "any state agency, board, or commission, any county, city and county, city, *regional agency,* public district, redevelopment agency, or *other political subdivision.*" *Id.* § 21063 (emphasis added). This definition is sufficiently broad to encompass TRPA, particularly given the mandate that CEQA be interpreted "in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." *Friends of Mammoth v. Board of Supervisors,* 8 Cal.3d 247, 259, 104 Cal.Rptr. 761, 768, 502 P.2d 1049, 1056 (1972), *cited with approval in* 14 Cal. Adm.Code § 15011.5(f), Reg. 78, No. 5 (1978).

■ Even if the California legislature intended for the CEQA provisions to apply to TRPA, however, such application is precluded unless the Compact reserves to California the right to impose such requirements on the bi-state agency. The Compact was approved by Congress the year before the CEQA provisions were enacted, and thus it does not expressly refer to that legislation. But we conclude that California has the right to impose the CEQA provisions on TRPA projects under the authority of Article VI(a) of the Compact, which provides in relevant part:

> Every such ordinance, rule or regulation [adopted by TRPA to effectuate its regional plan] shall establish a *minimum* standard applicable throughout the basin, and *any political subdivision may adopt and enforce an equal or higher standard* applicable to the same subject of regulation in its territory.

(Emphasis added.) Since the Compact as presently written does not require an EIR or public disclosure of comparable information, California as a "political subdivision" [16] may require that public agencies including TRPA meet the higher disclosure standard

of CEQA before they carry out or approve projects in the California portion of the Tahoe basin.

■ TRPA's arguments as to why it is not subject to CEQA are unavailing. TRPA suggests that application of the CEQA provisions would give California the power unilaterally to impose its will on the bi-state agency and therefore would be contrary to the intention of the framers of the Compact. Irrespective of whether this argument has general merit, it fails in the present context, for CEQA merely imposes *disclosure* requirements. The heart of CEQA is the EIR, the purpose of which it to provide other governmental agencies and the public generally with detailed information about the significant effects which a proposed project is likely to have on the environment, to identify alternatives to the project, and to indicate ways in which significant effects can be mitigated or avoided. Cal.Pub.Res.Code § 21061 (West 1977); 14 Cal.Adm.Code §§ 15011.6, 15012, Reg. 78, No. 5 (1978). While CEQA requires that major consideration be given to preventing environmental damage, it recognizes that public agencies also have the obligation to consider economic and social factors in determining whether and how a project should be approved. Accordingly, a proposed project that would have a significant effect on the environment can be approved and carried out notwithstanding that specific economic, social, or other considerations make mitigating measures or project alternatives infeasible if the agency states in writing the reasons which support its actions and if these reasons are supported by the final EIR and other information in the record. Cal.Pub.Res.Code § 21002 (West 1977); 14 Cal.Adm.Code §§ 15088, 15089, Reg. 78, No. 5 (1978). Thus applying CEQA to TRPA would not give California the power to overrule TRPA.

---

'local agency' on the other hand] is not of much practical importance" given the statutory definitions of those terms.

**16.** The term "political subdivision" as used in Article VI(a) is not defined in the Compact. Article VIII(a) states that the Compact should "be reasonably and liberally construed to effec-

tuate the purposes thereof." In view of the legislative goal of achieving a unified and less fragmented solution to the basin's problems, it is reasonable to conclude that the term "political subdivision" as used in Article VI(a) refers not only to political subdivisions of the signatory states but also to those states themselves.

538

■ TRPA also asserts that it is impliedly exempt from CEQA because its review provisions are the functional equivalent of CEQA's EIR requirement. While a number of federal cases have recognized an implied exception from NEPA's EIR requirement in situations in which a particular agency's regulations require a "functional equivalent" of the EIR, *see, e. g., Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 379–87 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), apparently no such implied exemption to CEQA was intended. *See Wildlife Alive v. Chickering,* 18 Cal.3d 190, 132 Cal.Rptr. 377, 553 P.2d 537 (1976). Moreover, the mere fact that CEQA's and TRPA's provisions are both intended to protect the environment does not make them functional equivalents. TRPA's provisions do not expressly assure that reasonable alternatives to proposed projects and mitigating measures will be identified, assessed, and disclosed, and therefore the TRPA requirements are not functionally equivalent to those of CEQA.

■ Finally, TRPA cites *Flint Ridge Development Co. v. Scenic Rivers Association of Oklahoma,* 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), in support of the argument that CEQA is inapplicable to it because the time demands involved in the preparation of EIRs [17] would conflict with the Compact's requirement that a project is deemed approved unless TRPA acts within 60 days after the project is submitted to it. Compact, Article VI(k). An analysis of *Flint Ridge* shows that its holding is inapposite here, however.

The issue in *Flint Ridge* was whether the Department of Housing and Urban Development (HUD) was required to prepare an EIR pursuant to NEPA before it could allow a disclosure statement filed with it by a private real estate developer pursuant to the Interstate Land Sales Full Disclosure Act (Disclosure Act), 15 U.S.C. §§ 1701–1720 (1976), to become effective.[18] In order to protect developers from costly delays as a result of this need to register with HUD, the Disclosure Act provides that a statement of record becomes effective 30 days from the date filed. *Id.* § 1706. The Secretary and Flint Ridge argued, *inter alia,* that NEPA should not apply to HUD's role under the Disclosure Act because compliance with both the EIR requirement of NEPA and the 30-day rule of the Disclosure Act was not possible.

The Court in *Flint Ridge* used a two-step analysis in determining that NEPA was not applicable to HUD's role under the Disclosure Act. First, the Court noted that NEPA directs federal agencies to comply with its terms "to the fullest extent possible." 42 U.S.C. § 4332 (1976). Thus by its terms NEPA must yield where there is a clear and unavoidable conflict in statutory authority.[19] 426 U.S. at 787–88, 96 S.Ct.

17. "Draft environmental impact statements on simple projects prepared by experienced personnel take some three to five months to complete, at least in the Department of the Interior. Complex projects prepared by inexperienced personnel may take up to 18 months to prepare." *Flint Ridge,* 426 U.S. at 789 n.10, 96 S.Ct. at 2438 n.10 (citing Sixth Annual Report, Council on Environmental Quality 639 (1975)).

18. The Disclosure Act is designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose certain information to potential buyers by filing a statement of record with HUD. The statement of record contains information regarding the title of the land; the terms and conditions for disposing of lots; the conditions of the subdivision, including access, noise, safety, sewage, utilities, proximity to municipalities, and the nature of the develop-

er's proposed improvements; various other specified data; and such additional information "as the Secretary [of HUD] may require as being reasonably necessary or appropriate for the protection of purchasers." 15 U.S.C. § 1705(12) (1976). *See generally id.* § 1705.

19. The Senate and House conferees, who wrote the "to the fullest extent possible" language into NEPA, explained that the purpose of the clause:

is to make it clear that each agency of the Federal Government shall comply with the directives set out in such subparagraphs (A) through (H) [of § 102(2) of NEPA, 42 U.S.C. § 4332(2) (1976)] unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible. If such is found to be the case, then compliance with

2430. Second, the Court determined that requiring the Secretary of HUD to prepare an EIR pursuant to NEPA would create an irreconcilable and fundamental conflict with the Secretary's duties under the Disclosure Act. *Id.* at 788–91, 96 S.Ct. 2430. While the Secretary did have the power to suspend the 30-day period if the statement of record was incomplete or inaccurate, the Court emphasized that his discretion was limited to requiring information that would further the legislative purpose of providing information necessary to potential buyers or in the public interest.[20]

The present case is distinguishable from *Flint Ridge* under both steps of the Supreme Court's analysis. First, the applicability of CEQA, not NEPA is at issue here. Although CEQA was apparently patterned after NEPA, *see Keith v. Volpe,* 352 F.Supp. 1324, 1337 (C.D.Cal.1972), *aff'd,* 506 F.2d 696 (9th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Friends of Mammoth v. Board of Supervisors,* 8 Cal.3d 247, 260–61, 104 Cal. Rptr. 761, 769–70, 502 P.2d 1049, 1057–58 (1972), it is is not identical to NEPA, and one difference is that it does not include NEPA's mandate that agencies comply with

its requirements "to the fullest extent possible." *See* Cal.Pub.Res.Code §§ 21100, 21151 (West 1977). Thus, unlike NEPA, CEQA does not by its terms provide that it must yield where it conflicts with other statutory authority.[21]

More importantly, we find that here, unlike in *Flint Ridge,* there is no conflict between the EIR requirement and the time period within which action must be taken. TRPA's regulations expressly permit it to deny placing an item on its agenda when, in its judgment, "insufficient information is received to adequately assess the merits of the proposal," in which case the 60-day period within which TRPA must review the proposal does not commence until sufficient information is received. Rules and Regulations of Practice and Procedure of TRPA, § 7.17. Since the primary purpose of TRPA, unlike that of HUD under the Disclosure Act is to protect the environment, it is reasonable to interpret this regulation to mean that the 60-day period shall not commence until an EIR, or information for an EIR, is submitted to TRPA.[22] Indeed, in stating that EIRs "will be required by the appropriate jurisdiction prior to actual con-

---

the particular directive is not immediately required.

H.R.Rep.No.91–765, 91st Cong., 1st Sess. 9, *reprinted in* [1969] U.S.Code Cong. & Admin. News, pp. 2767, 2770. *See also* Counsel on Environmental Quality's Guidelines to the Preparation of Environmental Impact Statements, 40 C.F.R. § 1500.4 (1977).

**20.** The Court left open the possibility that EIRs could be required in the future. While the Secretary has the power to order only information necessary for "the protection of purchasers" in statements of record, 15 U.S.C. § 1705(12) (1976), the Secretary can order inclusion in property reports of information "necessary or appropriate in the public interest or for the protection of purchasers," *id.* § 1707(a). Since by regulation the property report must be included in the statement of record, 24 C.F.R. §§ 1710.20(a), (e), 1710.110 (1977), information necessary "in the public interest" may in effect be required in the statement of record as well. 426 U.S. at 792 n.14, 96 S.Ct. 2430. The Court therefore concluded:

[I]f the Secretary finds it necessary for the protection of purchasers or in the public interest, the Secretary may adopt rules requir-

ing developers to incorporate a wide range of environmental information into property reports to be furnished prospective purchasers . . . .

*Id.* at 792, 96 S.Ct. at 2440.

**21.** In attempting to reconcile the provisions of CEQA and areas of potential conflict with other state law, the California Supreme Court has indicated that CEQA will likely prevail. *See Bozung v. Local Agency Formation Comm'n,* 13 Cal.3d 263, 118 Cal.Rptr. 249, 529 P.2d 1017 (1975). *See also* J. Longtin, *California Land Use Regulations* 362 (1977).

**22.** CTRPA, which must act within 60 days on projects submitted to it for approval, Cal. Gov't Code § 67100.1 (West Supp.1978), routinely prepares or causes to be prepared EIRs pursuant to CEQA on projects which come before it for approval. Its regulations provide that applications for CTRPA approval must be accompanied by an EIR and/or certain other information and that the 60-day period will not commence prior to the receipt and the determination of adequacy of the foregoing materials. CTRPA Land Use Ordinance, § 4.16.

struction"[23] of projects undertaken pursuant to TRPA's regional transportation plan, the TRPA staff impliedly recognized that the preparation of EIRs pursuant to CEQA is not inconsistent with the 60-day rule or with any other provision of the Compact.

While denying that it is subject to CEQA, defendant TRPA contends that EIRs prepared on its proposed transportation plan complied with CEQA. Whether this is true is a question of fact which we need not decide here. Since plaintiff has alleged facts which if proven could entitle it to relief, defendant TRPA's motion to dismiss for failure to state a claim is denied.[24]

3. *The Applicability of the CTRPA Approval Provisions to the California Loop Road Project.* The CTRPA transportation plan does not include the loop road project, and the City obtained TRPA approval to undertake the proposed Pine Boulevard improvements without first submitting the proposal to CTRPA. Plaintiff argues that the City therefore violated the CTRPA approval provisions.[25] The City responds that this claim should be dismissed for failure to join CTRPA as a party as required by Rule 19 of the Federal Rules of Civil Procedure and because it is a pendent state claim. It also argues that the Compact prohibits CTRPA from adopting a transportation plan which conflicts with that of TRPA.

In support of its joinder argument, the City notes that a state court has considered the same issue in a wholly separate action brought by CTRPA. *California Tahoe Regional Planning Agency v. City of South Lake Tahoe,* No. 31911 (Super.Ct. El Dorado, Oct. 6, 1978). It contends that, absent the joinder of CTRPA, there is a substantial risk that it will be subject to "inconsistent obligations" within the meaning of rule 19(a)(2)(ii).[26] This argument is not persuasive, however, for resolution of the present issue could result in only one possible obligation—to obtain CTRPA ap-

23. In its Draft Environmental Impact Report on the Tahoe Regional Transportation Plan (Dec. 1974), the TRPA staff stated:

It should be remembered that this report is for a regional transportation plan and is not an impact report for the construction of a particular transportation facility. The level of detail of this report is accordingly not as precise. *A more detailed environmental impact report will be required by the appropriate jurisdiction prior to actual construction of any transportation facility recommended in this plan.*

*Id.* at I–2 (emphasis added).

The TRPA staff recently acknowledged the importance of the information which an EIR would provide. In a report discussing the proposed Nevada loop road project, it stated:

An important factor in consideration of whether or not the remainder of the system will be built is the impact of the system as a whole on the California side of the Stateline area. TRPA has neither an assessment of these impacts nor plans documenting proposed mitigation measures. The submission of such an assessment and documentation would provide a much firmer foundation for action by TRPA and if that documentation identifies significant benefits, it would enhance considerably the prospects for completion of the facility.

TRPA Staff Summary and Recommendation 9 (March 14, 1978).

24. We recognize that, because the applicability of CEQA to TRPA has not previously been established by judicial decision, some projects may have been commenced with TRPA approval even though the requirements of CEQA had not been satisfied. Whether an exception to the applicability of CEQA for such projects is appropriate need not be decided here.

25. California Government Code § 67103 provides: "All public works projects shall be reviewed prior to construction and approved by the agency [CTRPA] as to the project's compliance with the adopted regional general plan [of CTRPA]." Section 67103.1 further provides: "All public works projects submitted to the agency for review and approval *must receive the agency's approval before they can be submitted to the Tahoe Regional Planning Agency.*" (Emphasis added.)

26. Rule 19 provides in relevant part:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may . . . (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

proval prior to undertaking the California loop road project. Thus inconsistent decisions regarding this issue would not give rise to inconsistent obligations. The City also suggests that this "pendent state claim" should be dismissed to avoid duplicity of litigation and the possibility of inconsistent decisions. Plaintiff's assumption that this claim is pendent is erroneous, however, for its resolution requires the construction of the Compact and therefore presents a federal question. *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); *League to Save Lake Tahoe v. B. J. K. Corp.,* 547 F.2d 1072 (9th Cir. 1976). Thus plaintiff can properly maintain this cause of action notwithstanding that CTRPA is not a party.

 Next we address the merits of the argument that the City, in undertaking the loop road project, is subject to the CTRPA approval provisions. Plaintiff contends that the Compact permits CTRPA to adopt and enforce its transportation plan, notwithstanding that such plan is inconsistent with that of TRPA, because the CTRPA plan constitutes an "equal or higher standard" within the meaning of Article VI(a) of the Compact. Relying on other language in Article VI(a) and on Article V(c), the City responds that CTRPA can adopt equal or higher standards, which it can then enforce through the CTRPA approval provisions, only if such standards conform to the TRPA plan and do not contradict it. The resolution of this issue therefore turns on (1) whether the Compact permits CTRPA to adopt standards which are higher than but which conflict with the TRPA general plan, and, if so, (2) whether the CTRPA transportation plan is such a higher standard.

Article VI(a) of the Compact provides in relevant part:

> Every such ordinance, rule or regulation [adopted by TRPA] shall establish a *minimum* standard applicable throughout the basin, and *any political subdivision may adopt and enforce an equal or higher standard applicable to the same subject of regulation in its territory. . . .* Whenever possible without diminishing the effectiveness of the interim plan or the general plan [of TRPA], the ordinances, rules, regulations and policies shall be confined to matters which are general and regional in application, leaving to the jurisdiction of the respective states, counties and cities the enactment of specific and local ordinances, rules, regulations and policies which *conform* to the interim or general plan.

(Emphasis added.)[27] The literal language of the first sentence quoted above permits CTRPA as a political subdivision[28] to set higher standards than the minimum standards of TRPA. The second sentence merely states that TRPA should generally confine its authority to regional matters and should let the respective states, counties and cities adopt rules and policies consistent with the TRPA plan to govern local matters; it does not restrict the equal or higher standards permitted by the first sentence to those which conform to the TRPA plan.

This literal interpretation of the quoted passage is supported by the legislative history of the Compact, which indicates that the first sentence quoted above, which permits political subdivisions to adopt higher standards, was added *after* the second quoted sentence.[29] Thus the purpose of the

**27.** On May 13, 1977, Nevada adopted Senate Bill No. 266, which would amend Article VI(a) to provide that political subdivisions may adopt equal or higher standards only "if that higher standard does not conflict with the adopted regional plan of the agency." S.B. 266 (amending Nev.Rev.Stat. § 277.200 effective upon proclamation by the governor of Nevada that the Nevada amendments to the Compact have been enacted by California and approved by Congress). The City's position in the present

case in essence is that the substance of the above amendment is implicitly contained in the language of the present Compact.

**28.** California Government Code § 67040 expressly provides that CTRPA was intended to be considered a "political subdivision" within the meaning of Article VI of the Compact.

**29.** In order to secure congressional approval of a bi-state compact as required by the Constitu-

second quoted sentence could not have been to restrict such equal or higher standards to those which conform to the TRPA plan.

The City also argues that political subdivisions may not adopt equal or higher standards which conflict with the TRPA plan because of Article V(c) of the Compact, which provides: "All provisions of the Tahoe regional general plan shall be enforced by the agency and by the states, counties and cities in the region." This provision was in the original California legislation and in the Nevada bill as it was originally introduced, and thus a convincing argument can be made that the subsequent "equal or higher standard" amendment created an implicit exception to this rule.

Our conclusion that the Compact permits CTRPA to set higher standards even if such standards conflict with the TRPA plan is further supported by evidence of the intent of the framers. There does not appear to be any legislative history directly explaining why the "equal or higher standard" amendment was added. However, an examination of the context in which this amendment was added indicates that, at least from California's point of view, its purpose was to permit CTRPA to set higher standards in the California portion of the basin than TRPA's standards applicable to the basin as a whole.

Assembly Bill No. 1362, which contained the original California legislation creating TRPA, also created CTRPA to function as an interim agency with the power to deal with regional problems in the California portion of the basin only until the bi-state agency was approved by Congress, at which

time it would dissolve. A.B. 1362, § 4 (1967). After California enacted this legislation, Nevada adopted an analogous proposal which contained several significant differences from the California legislation. The Nevada version included a "negative dual majority" rule which provided that a majority vote of the TRPA members *from each state* was required to *reject* any project. *See* Article III(g).[30] The Nevada legislation also provided that, whenever TRPA approval of any project was required, TRPA must act within 60 days or the project would be deemed approved. Article VI(k).[31] Other Nevada provisions that differed from the California legislation also generally reduced TRPA's power and ensured Nevada's sovereignty over the gaming industry. *See generally* Note, *Regional Government for Lake Tahoe*, 22 Hastings L.J. 705, 713–14 (1971).

In order to conform its TRPA legislation to that of Nevada, California enacted Assembly Bill No. 1023. That same bill also amended the CTRPA provisions so that CTRPA would continue until its enacting legislation is repealed, *compare* A.B. 1362, § 4 *with* Cal.Gov't Code § 67130 (West Supp.1978), would have the power to approve or disapprove proposed public works projects, *id.* §§ 67103, 67103.1, and would be deemed a "political subdivision" within the meaning of Article VI of the Compact, *id.* § 67040, so that it could adopt and enforce higher standards of control within the California sector of the basin.

This background supports the conclusion that the "equal or higher standard" provision should be given its literal meaning and that CTRPA should be permitted to adopt

tion, the legislation enacted by both states must be identical in every respect. On August 30, 1967, California adopted Assembly Bill No. 1362 creating TRPA. Nevada subsequently made a number of amendments to the California provisions and adopted Senate Bill No. 9 on February 23, 1968. On August 2, 1968, California enacted Assembly Bill No. 1023 amending the previous California legislation so that the bi-state agency proposed by each state would be identical.

The second quoted sentence was in Nevada Senate Bill No. 9 the first time it was read on February 5, 1968. The first quoted sentence

containing the equal or higher standard provision was not added until February 21, 1968. *See* Amendment No. 1295 to Senate Bill No. 9.

**30.** The analogous provision in California Assembly Bill No. 1362 provided that a majority vote of the members of the governing body present was required to take action, except that a majority vote of the members representing each state was required to take action with respect to fiscal and budget matters.

**31.** The original California legislation had no such provision.

higher standards applicable to the California portion of the basin irrespective of whether such standards conform to the TRPA plan. The Compact gives the local interests of either of the signatory states a great deal of power over development in the region. It is not illogical that the framers would have tempered this power by providing that the TRPA provisions establish minimum standards only and that the political subdivisions could adopt and enforce higher standards in their respective territories. Indeed, the fact that California's conforming amendments and its amendments to the CTRPA provisions were contained in the same legislation, A.B. 1023, suggests that California might not have adopted the conforming amendments but for the language which appeared to permit CTRPA to set higher standards in the California portion of the basin.

A corollary question is whether the CTRPA transportation plan is an "equal or higher standard" rather than a lower standard than the TRPA transportation plan. While the minimal information about such plan in the record suggests that the CTRPA plan is such a higher standard, we defer a final resolution of this issue until the facts have been more fully presented.

4. *The Applicability of CEQA to the City.* Finally, as a pendent claim, plaintiff asks for a declaratory judgment that the City, in processing the California loop road improvements, is subject to the provisions of CEQA.

■ The City is clearly a "local agency" and a "public agency" within the meaning of CEQA, Cal.Pub.Res.Code §§ 21062, 21063 (West 1977), and must therefore prepare and certify the completion of an EIR on any project it proposes to carry out or approve which may have a significant effect on the environment, *id.* §§ 21080, 21151.[32] The City does not attempt to refute this anywhere in its briefs. While the City's position is unclear, it appears to believe that the requirements of CEQA have been met

as to the loop road project and that the Pine Boulevard improvement falls within a categorical exemption to CEQA, *see* Cal. Pub.Res.Code § 21084 (West 1977); 14 Cal. Adm.Code § 15101, Class 1(c), Reg. 76, No. 41 (1976), because it allegedly was designed to remedy safety problems of an existing street rather than to facilitate the loop road project. Whether in fact either or both of these arguments are valid present factual questions which we cannot decide at this point in the litigation.

## IV. PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Now we turn to the merits of plaintiff's motion for a preliminary injunction enjoining the construction of the California segments of the loop road project, including acquisition of rights of way therefor.

■ There is no evidence in the record that defendants plan in the foreseeable future to undertake any improvements other than that to the Pine Boulevard access road. Since there is no presently existing threat, it would be premature at this time to consider an injunction of such broad scope as that requested by plaintiff. *See Holiday Inns of America, Inc. v. B & B Corp.,* 409 F.2d 614, 618 (3d Cir. 1969). We reserve jurisdiction in this matter, however, and should the City undertake to construct or should TRPA approve the Montreal Road or Park Avenue improvements without complying with the requirements of CEQA or the approval provisions of CTRPA, we would then entertain motions to enjoin such activity. Thus we limit the scope of our present inquiry to determining whether the construction of the improvements to the Pine Boulevard access road should be enjoined.

■ The Ninth Circuit uses two alternative tests for determining whether a preliminary injunction should issue. To prevail, the moving party must meet its burden "of demonstrating *either* a combination of probable success and the possibility of irreparable injury or that serious questions are

---

**32.** Moreover, because the Tahoe basin is an area of critical environmental sensitivity, any EIRs prepared on projects located in the basin must be submitted to the State Clearinghouse. 14 Cal.Adm.Code § 15161.6(a), (b)(4)(A), Reg. 78, No. 5 (1978).

raised and the balance of hardships tips sharply in his favor." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir. 1975) (quoting *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir. 1973)) (emphasis added by *Inglis* court). *See also Pliscou v. Holtville Unified School District,* 411 F.Supp. 842, 851 (S.D.Cal.1976).

The record suggests that the cost of the improvements to the Pine Boulevard access road is estimated to be less than $5,000. Such an undertaking would not cause irreparable harm, for presumably the improvements could be removed at relatively minor expense or the loop road could be blockaded at the California-Nevada border if it is ultimately determined that the improvements should not have been undertaken.[33] Moreover, defendants have alleged that the unimproved Pine Boulevard access road posed a severe safety hazard to the approximately 8,000 cars a day already traversing that stretch. Since plaintiff has failed to show either irreparable harm or that the balance of hardships tips sharply in its favor, its motion for a preliminary injunction is denied.

IT IS SO ORDERED.

---

**33.** In light of this and because of the factual questions involved, we need not consider at this time plaintiff's claim that the construction of the California portion of the loop road project would generate an interstate nuisance.