**LEAGUE TO SAVE LAKE TAHOE et al., Plaintiffs-Appellants,**

v.

**TAHOE REGIONAL PLANNING AGENCY et al., Defendants-Appellees.**

No. 73–3611.

United States Court of Appeals, Ninth Circuit.

Nov. 22, 1974.

Certiorari Denied March 17, 1975.

See 95 S.Ct. 1398.

Coleman A. Blease of Karlton, Blease & Vanderlaan (argued), Sacramento, Cal., for plaintiffs-appellants.

Claire H. Greve (argued), of Johnson, Greve & Clifford, Sacramento, Cal., Forrest A. Plant (argued), Sacramento, Cal., for defendants-appellees.

Before KOELSCH and CHOY, Circuit Judges, and RENFREW,* District Judge.

---

\* The Honorable Charles B. Renfrew, United States District Judge, Northern District of California, sitting by designation.

1. Cal.Govt.Code § 66800 et seq. (West Supp. 1974), Nev.Rev.Stat. 277.190 et seq. (1971). Article I of the Compact expresses the joint concern over the area and establishes the purposes of the compact:

   "(a) It is found and declared that the waters of Lake Tahoe and other resources of the Lake Tahoe region are threatened with deterioration or degeneration, which may endanger the natural beauty and economic productivity of the region.

   "(b) It is further declared that by virtue of the special conditions and circumstances of the natural ecology, developmental pattern, population distribution and human needs in the Lake Tahoe region, the region is experiencing problems of resource use and deficiencies of environmental control.

   "(c) It is further found and declared that there is a need to maintain an equilibrium between the region's natural endowment and its manmade environment, to preserve the scenic beauty and recreational opportunities of the region, and it is recognized

## OPINION

RENFREW, District Judge:

In 1968 the states of California and Nevada entered into a compact to create a regional agency with extensive powers to regulate and control development within the Lake Tahoe Basin in order to protect the natural resources and ecological balance of the area.[1] In December of 1969 Congress gave its consent to the compact as provided for in Article I, § 10, cl. 3 of the United States Constitution.[2]

The Tahoe Regional Planning Compact ("Compact") created Tahoe Regional Planning Agency ("TRPA") and charged it with responsibility for developing within ninety days a regional interim plan and, within eighteen months, a regional plan which would reflect a wide variety of economic, environmental and social considerations. The Compact also directed the TRPA to adopt all ordinances, rules, regulations and policies necessary to effectuate the regional interim plan and the regional plan.

The League to Save Lake Tahoe, the Sierra Club and two individuals who re-

that for the purpose of enhancing the efficiency and governmental effectiveness of the region, it is imperative that there be established an areawide planning agency with power to adopt and enforce a regional plan of resource conservation and orderly development, to exercise effective environmental controls and to perform other essential functions, as enumerated in this title.

2. Article I, § 10 cl. 3 of the United States Constitution provides:

   "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

   The consent was given in Pub.L. 91–148, 83 Stat. 360 (1969), an act which contained, in addition to the consent and the language of the Compact, a general statement of Congressional purpose and several specific conditions imposed by Congress. Appellants' complaint did not raise any question as to the construction or application of any of these Congressionally imposed conditions.

side in the Tahoe area ("appellants") brought this action for declaratory and injunctive relief alleging, basically, that defendant TRPA has failed to comply with the legal requirements of the Compact. They contend that TRPA has failed to adopt a regional plan as required by the Compact, has failed to adopt certain implementing ordinances mandated by the Compact, has adopted other ordinances which are defective, and has failed to prepare a detailed environmental analysis as required by the Compact. In particular, appellants charge that defendant TRPA has granted "approval"[3] to the development projects of defendants Thomas Raley, Park Cattle Company and Harvey's Wagon Wheel, Inc., in violation of the Compact.

Jurisdiction in the district court was predicated solely on 28 U.S.C. § 1331(a).[4] On defendants' motion, the District Court dismissed the action without prejudice on the ground that it lacked jurisdiction over the subject matter of plaintiffs' claims. Appellants now appeal that determination.

The appeal here presents but a single issue, yet one of first impression: whether a federal court has original jurisdiction over this suit as one arising under the Constitution, laws or treaties of the United States. For the reasons developed in this opinion, we hold that it does, and we reverse the decision below.

Appellants advance two arguments in support of their contention that the construction of a Congressionally sanctioned interstate compact is a matter of federal law. First, they argue that Congressional consent transforms the Compact into a law of the United States. Second, they urge that the construction of an interstate compact requires the application of federal "common law" which is law of the United States within the meaning of § 1331(a). Because we agree with the first argument asserted by appellants, we have no occasion to consider the second.

For this case to be within the purview of § 1331(a), a right or immunity created by the Constitution or laws of the United States must be an essential element of plaintiffs' claim.[5] The gravamen of the complaint is the alleged failure of TRPA to comply with the requirements of the Compact in various particulars. To determine the nature and scope of these requirements requires a construction of the Compact. Such construction, therefore, forms an essential element of the complaint. Thus, if the Compact can properly be characterized as a "law" of the United States, then federal jurisdiction is established.

Counsel have not cited nor has independent research revealed any decision by the Supreme Court or any of the Circuit Courts of Appeals which deals directly with this issue.[6]

---

3. Affirmative approval has been given only to the project of defendant Raley. TRPA, by a split vote, failed to approve the project of defendants Park Cattle Company and Harvey's Wagon Wheel. Appellees contend that by operation of Article VI(k) of the Compact these projects may be deemed approved. That article provides:

"Whenever under the provisions of this article or any ordinance, rule, regulation or policy adopted pursuant thereto, the agency is required to review or approve any proposal, public or private, the agency shall take final action, whether to approve, to require modification or to reject such proposal, within 60 days after such proposal is delivered to the agency. If the agency does not take final action within 60 days, the proposal shall be deemed approved."

Appellants urge that a split vote on these projects cannot constitute failure to take "final action" within the meaning of Article VI(k) and, alternatively, that if those projects would be deemed approved, they violate the provisions of the Compact.

4. 28 U.S.C. § 1331(a) provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

5. Gully v. First National Bank, 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936).

6. Several district court decisions have been cited as authority that § 1331(a) jurisdiction does not lie in cases involving interstate compacts. We have reviewed these decisions carefully, and we do not find them to be

The Supreme Court has, however, in a series of cases considered the status of interstate compacts in connection with its certiorari jurisdiction. See Delaware River Com'n v. Colburn, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940); Dyer v. Sims, 341 U.S.. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951). In these cases the Court addressed the question of whether a claim based on an interstate compact is cognizable under the provision for Supreme Court review, by writ of certiorari, of judgments of the highest state court where "any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties or statutes

persuasive and, in some cases, even apposite to the precise issue before us.

In Delaware River Joint Toll Bridge Com'n v. Stults, 146 F.Supp. 241 (D.N.J.1956), plaintiff's claims were for money had and received; the compact was involved only because it was the legislation which had created the plaintiff Commission. Plaintiff's claims thus did not "arise under" the compact and regardless of the federal or nonfederal character of that compact, jurisdiction under § 1331(a) would have been improper. Relying upon Gully v. First National Bank, 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 the court held that since the respective rights of the parties were to be determined by local law, no federal question was presented.

In Port Authority Bondholder Pro. Comm. v. Port of N. Y. Auth., 270 F.Supp. 947 (S.D. N.Y.1967), the district court dismissed an action involving the construction of an interstate compact, concluding that such a claim did not arise under a law of the United States within the meaning of § 1331(a). Although the Court of Appeals for the Second Circuit, per Friendly, J., did not reach this question, it indicated that the District Court may have erred in its conclusion. 387 F.2d 259, 261 n. 1 (2d Cir. 1967). The Court of Appeals found that the allegations in that case concerning actions of the Port Authority beyond the scope of Congressional consent to the compact gave rise to a claim under the Constitution. The court also found, however, that the constitutional claim was insubstantial in light of prior adverse decisions of the United States Supreme Court and affirmed the district court on that basis. 387 F.2d at 262–263.

In Kheel v. Port of New York Authority, 331 F.Supp. 118, 120–121 (S.D.N.Y.1971), aff'd on other grounds, 457 F.2d 46 (2d Cir. 1972), cert. denied, 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972), the district court dismissed a claim involving the same compact but did so on the grounds adopted by the Second Circuit in Bondholders.

In Rivoli Trucking Corp. v. American Export Lines, 167 F.Supp. 937 (E.D.N.Y.1958), the court found no federal question jurisdiction under § 1331(a) in a compact case, but the decision contains an alternate holding that the plaintiffs' claims were within the exclusive jurisdiction of the Federal Maritime Board. 167 F.Supp. at 940. Further, in reaching its conclusion on § 1331(a) jurisdiction, the court relied primarily on Hinderlider v. La Plata River and Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938). See note 8, infra, for a discussion of the impact of Delaware River Com'n v. Colburn, 310 U.S. 419, 60 S.Ct. 1039, 84 L.Ed. 1287 (1940) upon Hinderlider.

Of the district court opinions which have been examined, only one, in dictum, cogently argues in any detail against § 1331(a) jurisdiction in a case arising under an interstate compact, and it predates the critically important decision of the Supreme Court in Petty v. Tennessee-Missouri Com'n, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). The case, Delaware River Joint Toll Bridge Com'n v. Miller, 147 F.Supp. 270 (E.D.Pa.1956), involved the compact considered in Stults, supra, and presented similar claims for money had and received. The decision, like Stults, rests on the failure of the complaint to satisfy the requirements of Gully v. First National Bank. See 147 F.Supp. at 274. Judge Van Dusen, the author of the opinion, went on to indicate that, Gully problems aside, rights asserted under an interstate compact lack the requisite federal character to sustain jurisdiction under § 1331(a). The subsequent decision of the Supreme Court in Petty v. Tennessee-Missouri Com'n, supra, holding that the construction of a compact sanctioned by Congress is a matter of federal law, has, however, eroded the major premise of Judge Van Dusen's argument. See notes 11 and 12, infra, for a full discussion of that argument and the effect of Petty upon it.

In contrast to the authorities cited by appellees, appellants rely upon a single case which they argue supports their position. That case, involving the very bi-state compact here in issue, sustained jurisdiction under 28 U.S.C. § 1331(a). Brown v. Tahoe Regional Planning Agency, Civil No. R12773 (D.Nev. May 23, 1973). That case is not persuasive here because it involved a claim for inverse condemnation clearly arising under the Fifth Amendment. The court did note, however, that "[t]he case arises under the Constitution and laws of the United States, involving the interpretation and application of Public Law 91–148 [The Tahoe Regional Planning Compact] and of the Fifth Amendment to the Constitution of the United States. Brown, supra, at p. 2 (emphasis supplied).

of * * * the United States." 28 U.S.C. § 1257(3). In *Colburn* the Court unequivocally answered this question in the affirmative, holding that "the construction of such a [bi-state] compact sanctioned by Congress by virtue of Article I, § 10 cl. 3 of the Constitution, involves a federal 'title, right, privilege or immunity' which when 'specially set up or claimed' in a state court may be reviewed here on certiorari under § 237(b) of the Judicial Code [the predecessor of § 1257(3)]." 310 U.S. at 427, 60 S.Ct. at 1041. The Court has reaffirmed this holding in *Dyer*, 241 U.S. at 26, 71 S.Ct. 557, 95 L.Ed. 713.

In reaching this interpretation of the certiorari statute, *Colburn* and its progeny have firmly established that the con-

struction of a compact, by virtue of Congressional consent, presents a federal question. This result has its genesis in the case of Pennsylvania v. The Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 518, 15 L.Ed. 435 (1851), wherein the court stated that "this compact [the Virginia-Kentucky Compact of 1789] by the sanction of Congress, has become a law of the Union. What further legislation can be desired for judicial action?" 54 U.S. at 565, 15 L.Ed. 435.[7] Although later decisions created considerable doubt as to the continued validity of that doctrine, *Colburn* has put these doubts to rest.[8]

■ While the Court in *Colburn* felt it unnecessary to clearly articulate the basic premise of its decision, we conclude

---

7. The Virginia-Kentucky Compact provided that "the use and navigation of the River Ohio, so far as the territory of the proposed state [Kentucky], or the territory that shall remain within the limits of this Commonwealth [Virginia] lies thereon, shall be free and common to the citizens of the United States." 54 U.S. at 564–565, 15 L.Ed. 435. *Wheeling* was a suit by Pennsylvania to enjoin the construction of a bridge in Virginia across the Ohio River. The Court first noted that, to constitute an actionable nuisance, the bridge had to be found in violation of state or federal law. Since the State of Virginia had expressly approved the construction of the bridge, the only source of a possible violation was federal law. The court concluded that the Virginia-Kentucky Compact of 1789 was, by virtue of congressional consent, a federal law, and that the bridge contravened the provision of that compact set forth above. The requested relief was therefore granted. 54 U.S. at 578, 15 L.Ed. 435.

8. The Court in *Colburn* did not explicitly set forth a doctrinal basis for its conclusion that a claim based on the construction of an interstate compact involves a federal right, title or immunity for purposes of sustaining jurisdiction in certiorari cases from state courts. Appellees strenuously argue that *Colburn* does not rest on the law of the Union doctrine but rather upon the applicability of federal common law to the construction of certain compacts. In support of this interpretation of *Colburn*, they rely on People v. Central Railroad, 79 U.S. 455, 20 L.Ed. 458 (1872), and Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938). This reliance is misplaced. Clearly both cases rejected the law of the Union doctrine, 79 U.S. at 455, 20 L.Ed. 458 and 304 U.S. at 109, 58 S.Ct. 803,

82 L.Ed. 1202. It is equally clear, however, from a careful reading of *Colburn* that *Colburn* disapproves both holdings on this point. The Court said in *Colburn*: "In People of New York v. Central Railroad * * * jurisdiction of this Court to review a judgment of a state court construing a compact between states was denied on the ground that the Compact was not a statute of the United States and that the construction of the Act of Congress giving consent was in no way drawn in question, nor was any right set up under it. This decision has long been doubted, see Hinderlider v. La Plata Co., 304 U.S. 92, 110, note 12, and we now conclude that construction of such a compact sanctioned by Congress by virtue of Article I § 10 Clause 3 of the Constitution, involves a federal 'title, right, privilege, or immunity' which when 'specially set up or claimed' in a state court may be reviewed here on certiorari * *." 310 U.S. at 427, 60 S.Ct. at 1041.

It can hardly be disputed that *Colburn* has expressly overruled *Central Railroad* on the question of the viability of the law of Union doctrine.

In arriving at our decision we do not overlook that the law of the Union doctrine may be said, under some circumstances, to present certain theoretical problems, e. g., impermissible delegation of congressional legislative power to the states in cases where Congressional consent precedes the compact. For an exhaustive analysis of this subject, see Engdahl, Construction of Interstate Compacts: A Questionable Federal Question, 51 Va.L.Rev. 987, 1013–1026 (1965). The possibility, however, that there may be problems in potential cases does not alter our duty to follow the mandate of *Colburn*.

after careful investigation that the result there was based upon the implicit finding that the interstate compact involved was a "statute of the United States" within the meaning of 28 U.S.C. § 1257(3). Neither logic nor policy justifies a different interpretation of the substantially similar language in 28 U.S.C. § 1331(a).[9] Therefore, a case involving the construction of an interstate compact which requires a judicial determination of the nature and scope of obligations set forth therein "arises" under the "laws" of the United States within the meaning of § 1331(a).[10]

■ We do not, of course, ignore the significant differences between original jurisdiction in the federal courts and certiorari jurisdiction in the Supreme Court. The test for determining whether a case involves substantial federal issues at the very outset of litigation differs from the test for making that determination after the case has passed through a state judicial system. For this reason in cases in which there is a claim of original jurisdiction, there is the *Gully* requirement that the federal question form an "essen-

tial element" of the plaintiff's complaint.[11] No such requirement exists with respect to certiorari jurisdiction. There it is the record in the state tribunal and not the original complaint which must support the claim of a federal question. See Mishkin, The Federal Question in the District Courts, 53 Colum.L.Rev. 157, 164–165. To erect, in addition, a distinction between what constitutes a federal law for certiorari purposes and what constitutes a federal law for original jurisdiction purposes would be artificial, unnecessary and irrational; we decline, therefore, to do so. The Compact must be deemed a law of the United States under *Colburn* and the requirements of *Gully* have been satisfied in this case. Therefore, jurisdiction should have been sustained in the district court under § 1331(a).

■ Furthermore, post-*Colburn* decisions of the Supreme Court and strong policy considerations support this result. Appellees have argued that the need for a final arbiter of compact disputes requires only certiorari jurisdiction, and that the desirability of having state

---

9. In pertinent part the two statutes provide:
   "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court as follows:
   \* \* \* \* \* \*
   "(3) By writ of certiorari, \* \* \* where any title, right, privilege or immunity is specially set up or claimed under the Constitution, treaties, or statutes of, or commission held or authority exercised under, the United States." 28 U.S.C. § 1257.
   "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy \* \* \* arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331(a).
   *Both an able commentator and an eminent jurist have concluded that the* Colburn *line of decisions establishes the propriety of § 1331(a) jurisdiction over claims arising under an interstate compact.* See Engdahl, Construction of Interstate Compacts: A Questionable Federal Question, *supra*, 51 Va. L.Rev. at 1026, and the opinion of Judge Henry J. Friendly in Port Authority Bondholders Pro. Comm. v. Port of N. Y. Auth., *supra*, 387 F.2d at 261 n. 1.

10. See the text of the opinion accompanying note 5, *supra*.

11. The cases which discuss the distinction between § 1257(3) jurisdiction and § 1331(a) jurisdiction confirm this view. See Jordine v. Walling, 185 F.2d 662 (3d Cir. 1950) and Doucette v. Vincent, 194 F.2d 834 (1st Cir. 1952). Both cases involved the question whether § 1331(a) jurisdiction exists over a claim for maintenance and cure based on general maritime law, as distinguished from a suit in admiralty brought under the admiralty rules. The cases reached contrary conclusions on this point and the controversy was resolved against § 1331(a) jurisdiction in Romero v. International Term. Co., 358 U.S. 354, 359–380, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). In the course of resolving the question concerning general maritime law, which is of course not relevant here, both lower courts noted the distinction between certiorari and original jurisdiction over claims based on federal law. Analysis of those cases reveals, however, that this distinction does not rest upon differing constructions of the two statutes as to what constitutes a law of the United States; rather it rests upon the differing stages of litigation at which the jurisdictional determination must be made, a difference to which the *Gully* requirement responds. *Jordine, supra*, 185 F.2d at 668; *Doucette, supra*, 194 F.2d at 845–846.

courts decide matters of state law, such as zoning and land use control, before that arbitration is undertaken precludes original jurisdiction in the federal courts.[12] We disagree. The Supreme Court has made it clear that the construction of an interstate compact is a matter of federal law, not the law of the party states. Petty v. Tennessee-Missouri Bridge Com'n, *supra*, 359 U.S. at 279–280, 79 S.Ct. 785, 3 L.Ed.2d 804.[13] State court consideration, therefore, cannot constitute a necessary predicate to proper construction of a compact.

Moreover, interstate compacts frequently involve not only local concerns of the states involved, but also important national interests. Dyer v. Sims, *supra*, 341 U.S. at 27, 71 S.Ct. 557, 95 L.Ed. 713. See also *Petty, supra*, 359 U.S. at 282, n. 1, 79 S.Ct. 785, 3 L.Ed.2d 804. The instant Compact deals with much more than mere local concerns such as zoning and land use. It addresses the environmental problems of an area not subject to the control of a single state. In addition to the specific Congressional concern for the subject of this Compact, evidenced by the statement of purpose accompanying the consent,[14] the national legislature has with increasing frequency evinced a strong interest in solving envi-

**12.** Perhaps the most articulate statement of this position is contained in Judge Van Dusen's opinion in Delaware River Joint Toll Bridge Com'n v. Miller, *supra*, 147 F.Supp. at 274 nn. 14 and 16. That the opinion predates *Petty, supra*, considerably diminishes the force of the arguments made therein. See note 13, *infra*. Moreover, Judge Van Dusen relied heavily upon the distinction between § 1257(3) jurisdiction and § 1331(a) jurisdiction made in *Jordine, supra*, and also considered in *Doucette, supra*. As we pointed out in note 11, *supra*, those cases do not support the conclusion reached in *Miller*.

**13.** *Petty* represents a significant clarification of prior law on this point. *Colburn* and *Dyer* held that a claim based on an interstate compact involved a federal right, title or immunity. In *Dyer*, however, Mr. Justice Frankfurter, speaking for the Court, intimated that this characterization did not contemplate that federal law would supplant state law as the source of the governing rules of decision in a compact case; rather that the Supreme Court would be the final expositor and arbiter of the applicable state laws. 341 U.S. at 28–31, 71 S.Ct. 557, 95 L.Ed. 713. In *Dyer* the Supreme Court of Appeals of West Virginia had held that certain provisions of the West Virginia Constitution prohibited West Virginia's participation in the Ohio River Valley Water Sanitation Compact. The Supreme Court concluded that "[t]he Supreme Court of Appeals of the State of West Virginia is, for exclusively State purposes, the ultimate tribunal in construing the meaning of her Constitution." 341 U.S. at 28, 71 S.Ct. at 561. The Court went on, however, to conclude that, insofar as a state constitution affected obligations under an interstate compact, the highest state court was *not* the ultimate tribunal in construing that constitution and reversed on the basis of its own construction of the applicable provisions of the West Virginia Constitution. "A State cannot be its own ultimate judge in a controversy with a sister State.

To determine the nature and scope of obligations as between States, whether they arise through the legislative means of compact or the 'federal common law' governing interstate controversies (Hinderlider v. La Plata Co., 304 U.S. 92, 110 [58 S.Ct. 803, 811, 82 L.Ed. 1202]), is the function and duty of the Supreme Court of the Nation. Of course every deference will be shown to what the highest court of a State deems to be the law and policy of its State, particularly when recondite or unique features of local law are urged. Deference is one thing; submission to a State's own determination of whether it has undertaken an obligation, what that obligation is, and whether it conflicts with a disability of the State to undertake it is quite another." 341 U.S. at 28, 71 S.Ct. at 560.

*Petty* involved the question of whether a "sue and be sued" clause in an interstate compact constituted a waiver of the party states' immunity under the Eleventh Amendment. The court conceded that under the applicable decisions of both the party states, such a clause would not constitute a waiver of immunity but concluded, by reference to the *Congressional* intent, that the clause constituted such a waiver. 359 U.S. at 279–281, 79 S.Ct. 785, 3 L.Ed.2d 804. Mr. Justice Frankfurter strongly dissented on the basis of his opinion in *Dyer*. 359 U.S. at 284–285, 79 S.Ct. 785, 3 L.Ed.2d 804. Thus, any rights or obligations created by an interstate compact are federal, not state, in character. As a result, there can be no doubt of the propriety of original jurisdiction in the federal courts in the case before us, despite the legitimate and far-reaching interests of the party states. See Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 674–679, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

**14.** The text of that statement is as follows:
"*Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled,*

**524**

ronmental problems, which by their very nature transcend state boundaries, through interstate cooperation. *See, e. g.,* The Clean Air Act, 42 U.S.C. § 1857 et seq., specially §§ 1857 and 1857a, and the National Environmental Policy Act,

> That in order to encourage the wise use and conservation of the waters of Lake Tahoe and the resources of the area around said lake, the consent of the Congress is hereby given to the Tahoe regional planning compact * * *. Public Law 91–148, December 18, 1969."

15. In pertinent part the Clean Air Act provides:

> "(a) The Congress finds—
> "(1) that the predominant part of the Nation's population is located in its rapidly expanding metropolitan and other urban areas, which generally cross the boundary lines of local jurisdictions and often extend into two or more States;
> "(2) that the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles, has resulted in mounting dangers to the public health and welfare, including injury to agricultural crops and livestock, damage to and the deterioration of property, and hazards to air and ground transportation;
> \* \* \* \* \* \*
> "(4) that Federal financial assistance and leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution.
> "(b) The purposes of this subchapter are—
> "(1) to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population;
> \* \* \* \* \* \*
> "(4) to encourage and assist the development and operation of regional air pollution control programs." 42 U.S.C. § 1857.

> "(a) The [Administrator] shall encourage cooperative activities by the States and local governments for the prevention and control of air pollution; encourage the enactment of improved and, so far as practicable in the light of varying conditions and needs, uniform State and local laws relating to the prevention and control of air pollution; and encourage the making of agreements and compacts between States for the prevention and control of air pollution.
> \* \* \* \* \* \*
> "(c) The consent of the Congress is hereby given to two or more States to negotiate and enter into agreements or compacts, not in conflict with any law or treaty of the

42 U.S.C. § 4331 et seq.[15] The result reached here serves those important national interests.

It is therefore most appropriate to sustain jurisdiction under 28 U.S.C.

> United States, for (1) cooperative effort and mutual assistance for the prevention and control of air pollution and the enforcement of their respective laws relating thereto, and (2) the establishment of such agencies, joint or otherwise, as they may deem desirable for making effective such agreements or compacts. No such agreement or compact shall be binding or obligatory upon any State a party thereto unless and until it has been approved by Congress. It is the intent of Congress that no agreement or compact entered into between States after November 21, 1967, which relates to the control and abatement of air pollution in an air quality control region, shall provide for participation by a State which is not included (in whole or in part) in such air quality control region." 42 U.S.C. § 1857a.

The Congressional Statement of Policy in the National Environmental Policy Act specifies:

> "(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, *in cooperation with State and local governments*, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331 (emphasis supplied).

The Act concerns itself primarily with the activities of the federal government. The reference, however, to cooperation with state and local governments in § 4331 and the awareness, reflected in the legislative history, that many, if not most, environmental problems cross state boundaries (see House Report 91–378, 1969 U.S. Congressional and Administrative News, p. 2751 at 2757, 2758) indicate the national importance of, and interest in, interstate attempts to address environmental concerns.

§ 1331(a) over a case involving the construction of the Tahoe Regional Planning Compact.

Accordingly, we reverse the decision below and remand for further proceedings consistent with this opinion.