CALIFORNIA TAHOE REGIONAL PLANNING AGENCY and People of the State of California, Plaintiffs-Appellants,

v.

Ted JENNINGS, Oliver Kahle, Harvey's Wagon Wheel, Inc., Park Cattle Co., and County of Douglas, Defendants-Appellees.

LEAGUE TO SAVE LAKE TAHOE, and the Sierra Club, Plaintiffs-Appellants,

v.

Ted JENNINGS, Oliver Kahle, Harvey's Wagon Wheel, Inc., Park Cattle Co., Del Webb International, Inc., County of Douglas, Defendants-Appellees.

Nos. 78–1160, 78–1224.

United States Court of Appeals, Ninth Circuit.

Feb. 15, 1979.

Rehearing Denied April 16, 1979.

E. Robert Wright, Sacramento, Cal. (argued), Charles Biblowit, Washington, D. C. (argued), Sanford Sagalkin, Dept. of Justice, Washington, D. C., for plaintiffs-appellants.

F. R. Breen (argued), Richard W. Blakey, Reno, Nev., Steven D. McMorris, Minden, Nev., John Frankovich (argued), Peter D. Laxalt (argued), Gordon H. DePaoli (argued), Reno, Nev., for defendants-appellees.

Before MERRILL and SNEED, Circuit Judges, and LINDBERG,[*] District Judge.

SNEED, Circuit Judge:

Appellants appeal from the district court's grant of appellees' motion to dismiss and denial of appellants' motions for a temporary injunction and for summary judgment in this suit to prevent the construction of four hotel-casinos at the south shore of Lake Tahoe. The appellants are California

---

[*] Hon. William J. Lindberg, Senior United States District Judge for the District of Washington, sitting by designation.

Tahoe Regional Planning Agency (CTRPA) and the State of California, the League to Save Lake Tahoe (League), and the Sierra Club. The appellees are Douglas County, Nevada, Ted Jennings, Oliver Kahle, Harvey's Wagon Wheel, Inc. (Harvey's), and Park Cattle Co. (Park), five in all. In their complaints, all appellants assert that certain administrative action of Douglas County violated the relevant portion of the California-Nevada interstate compact to regulate the Lake Tahoe Basin. The CTRPA and the State of California allege a second cause of action in which they assert a nuisance under federal common law against all appellees except Park.[1] After a hearing, the district court refused all relief to appellants and granted appellees' motion to dismiss. We affirm.

I.

*Factual Background.*

A. Facts Directly Relevant To This Case.

This case is only the latest in a series of cases, a sketch of which appears below, in which this court has been called upon to intervene in, interpret, or implement the provisions of the Tahoe Regional Planning Compact (Compact). California and Nevada entered into this Compact in 1968 and Congress gave its consent in December 1969. Pub. L. No. 91–148, 83 Stat. 360 (1969). The Compact created a regional agency, the Tahoe Regional Planning Agency (TRPA), with powers to regulate and control development within the Lake Tahoe Basin by adopting a regional plan and adopting all ordinances, rules, regulations and policies necessary to effectuate the plan. *See League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517, 518 (9th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975).

As this court previously noted:

---

1. The State of California and the CTRPA have abandoned their appeal against Park, therefore the federal common law interstate nuisance action remains only against the other appellees.

Pursuant to its mandate, the TRPA adopted various procedural regulations and imposed certain land use, height and density restrictions applicable to developments in the Basin. If a builder wanted to develop more than 200 square feet of land or to erect certain types of structures, he was required first to seek a permit from the local permit-issuing authority (generally, the zoning authority of the county in which the construction was to take place). The permit-issuing authority, according to TRPA regulations, was required to adhere to the policies and land restrictions adopted by the TRPA but was granted the power to issue variance permits under certain circumstances. *California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d 215, 216 (9th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). The TRPA can review variance permits issued by local zoning boards, but must act affirmatively to reverse or modify the permit grant by a dual majority within 60 days or the permit is "deemed approved" and the action of the local authority stands. *See California ex rel. Younger v. Tahoe Regional Planning Agency, supra.*

The TRPA adopted the ordinance at issue February 10, 1972. Land Use Ordinance § 7.13 limits the height of buildings in tourist-commercial areas to 40 feet,

> except that the permit-issuing authority, by administrative permit pursuant to Section 8.33, may authorize a greater height to the extent that the permit-issuing au-

thority determines that . . . (4) such greater height will better promote the protection of the environment of the area.

Section 8.33 requires that before issuing an administrative permit, a permit-issuing authority find that the particular use is not detrimental to the general welfare and will not cause substantial environmental consequences.

Each of the four defendant hotel-casino builders received administrative permits issued by the Douglas County Commissioners after hearings and a presentation of evidence. The sizes of the projects ranged in height from 100 feet (Kahle) to 193 feet (Harvey's); in number of hotel rooms from 446 (Park) to 960 (Kahle); and in land coverage from 45% (Kahle) to 75% (Harvey's). Park received the first permit April 20, 1973; Harvey's received its permit, the last of the four, on June 20, 1973. The Douglas County board issued written findings for the Jennings and Kahle projects which merely repeat verbatim the findings required by the Land Use Ordinance, but issued no written findings with respect to the Harvey's and Park permits. As the next step, the Nevada Tahoe Regional Planning Agency, a state agency empowered to exercise environmental control over gaming establishments in the Nevada side of the Basin, approved each project.[2] Finally, as required by TRPA ordinance, each project was presented to the TRPA for review.[3] In each case the TRPA failed to achieve a dual majority as to the projects, and the projects

2. The Nevada Tahoe Regional Planning Agency (NTRPA) did not come into existence as a functioning legal entity until April 30, 1973, ten days after the Douglas County Commissioners approved the Park permit. Nevertheless, the Park project received approval from NTRPA on June 14, 1973.

3. *Section 4.10 of the Land Use Ordinance* specifies two instances in which a permit is required before construction of a project can be commenced: (1) any project that will cover more than 200 square feet; (2) any construction that requires an administrative permit or variance permit under one or more of the substantive requirements of other sections of the Ordi-

nance. Section 4.30 sets out the process for Agency review of these locally issued permits. Permits issued under § 4.10(1) above do not require TRPA review. (§ 4.31). The local permit-issuing authority must notify TRPA of all applications for and issuances of permits. Section 4.34 requires that permits issued under § 4.10(2), such as those at issue in this case, be screened by the TRPA staff for review. The staff then must make a report with a recommendation to the TRPA for its action. Thus review of the permits at issue was mandatory, and the Douglas County Commission was responsible to notify TRPA that the permits had issued.

were "deemed approved."[4] Measured by sixty days from submittal to the TRPA, on September 20, 1973 Harvey's project, the last of the four projects to be so approved, received its so-called "default approval."

The present appeal springs from two separate actions, both filed in federal district court August 20, 1977, almost four years after the default approvals. One count of each complaint charges that each permit was invalid because not in compliance with the 40-foot height limitation in Land Use Ordinance (L.U.O.) § 7.13. California and the CTRPA also claimed that the building of the projects will result in a common law interstate nuisance adversely affecting California and its citizens. Defendants Jennings, Kahle and Harvey's moved to dismiss on numerous grounds without answering the complaints. Park answered and moved for summary judgment. After hearing oral argument and accepting submitted evidence, the district court issued its opinion on October 20, 1977, dismissing appellants' actions on several grounds. While these cases were on appeal, this court, on September 5, 1978, granted an injunction preventing Harvey's from commencing construction pending our decision.

B. A Sketch of Prior Litigation.

The present case is only one of several initiated in response to appellees' four projects. Various combinations of plaintiffs and defendants have skirmished inconclusively in both federal and state court. In the first case, filed September 20, 1973, the League and the Sierra Club initiated a suit in federal district court against the TRPA, Harvey's and Park claiming that the TRPA failed to comply with the Compact's requirements and focusing predominantly on the surface coverage provisions adopted by the TRPA. This suit engendered two opinions by this court; neither reached the substance of the claim. Thus, in *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517 (9th Cir. 1974), after the district court first dismissed the action for lack of subject-matter jurisdiction, we reversed, holding that interpretation of an interstate compact raised a federal question. After remand, in *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 558 F.2d 914 (9th Cir. 1977), we reversed a second dismissal seemingly premised upon impermissible joinder. Subsequent to these two reversals, the parties voluntarily dismissed a third appeal from a denial of a preliminary injunction.

In a second suit, filed August 7, 1974, the State of California attacked the validity of the Jennings and Kahle permits asserting that the permits could not be considered "deemed approved" because the TRPA's vote had failed to yield a dual majority. This court upheld the district court's interpretation of the Compact to the effect that a dual majority was required before any "action" could be taken, and that therefore the failure of a vote to yield a dual majority means that "the local permit issuing authority in effect stands affirmed." *California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d 215, 219 (9th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975). Afterwards, the district court dismissed the action "pursuant to the opinion and mandate of the United States Court of Appeals for the Ninth Circuit" on October 15, 1975.

The League filed suit against the TRPA and all appellees in Nevada state court on August 16, 1974. It claimed that the permit issuances violated TRPA ordinances and state and local permit requirements. The League asserted the same lack of findings and insubstantial evidence claims raised in the present suit. The trial court dismissed the action in September 1975 be-

4. The TRPA staff recommended denial of the Jennings and Kahle permits, but on July 25, 1974 the TRPA failed to reach a dual majority. Although all five California representatives voted against the projects, three of the five Nevada representatives voted for approval. The Harvey's project also received a negative staff recommendation, but four of five Nevada representatives and two of five California representatives voted to approve the project. Park's project had a positive staff recommendation, but a majority of the California representatives voted against the project.

cause the League failed to qualify to do business as a corporation in Nevada prior to filing the complaint. The Nevada Supreme Court affirmed the lower court, going on to state that refiling would be barred by the Nevada 25–day limitation period (N.R.S. § 278.027), for challenges to local land approvals. *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 563 P.2d 582 (Nev.1977).

Finally, the League filed suit May 3, 1976 in federal district court contending that air quality certificates for the Jennings and Kahle projects had been issued in violation of the Clean Air Act. Dismissed on jurisdictional grounds by the district court, this suit is presently on appeal to this court. *League to Save Lake Tahoe v. Trounday,* Ninth Circuit No. 77–2058.

## II.

*Issues To Be Resolved In This Appeal.*

To dispose of this appeal we must confront four clusters of issues. Initially, we must decide whether we have jurisdiction to consider the issues that this appeal presents. Because we conclude that jurisdiction exists, we then must turn to whether L.U.O. § 7.13 permits projects whose height corresponds to that of the appellees' projects. As we hold that such projects are not unconditionally barred by L.U.O. § 7.13, we then must consider whether the process by which Douglas County approved these permits is subject to attack on any valid grounds. Finally, we shall consider whether California can maintain an action in the circumstances of this case under federal common law for interstate nuisance. To these matters we now turn.

## III.

*Jurisdiction.*

▓▓▓ Generally, questions concerning the interpretation and application of TRPA

ordinances do present federal questions. *League to Save Lake Tahoe v. B.J.K. Corp.,* 547 F.2d 1072, 1075 (9th Cir. 1976). But in *B.J.K. Corp.* we recognized that questions arising under the TRPA ordinances did not invariably present federal questions; rather we adopted a pragmatic approach to determine "when construction of the Land Use Ordinance itself presents a federal question." 547 F.2d at 1074. The touchstone we· fashioned is

> whether interstate conflicts in the interpretation and application of the Ordinance may arise that may substantially affect the effective functioning of the Compact and whether, absent a federal trial forum, existing judicial mechanisms supply a practical means for resolving such conflicts.

*Id.*

Application of the Ordinance to this case is not difficult. The proper interpretation of L.U.O. § 7.13 lies at the heart of this litigation. Appellants argue that the 40–foot height limitation is mandatory and that significant departures can be approved only in accordance with the principles that govern the granting of a variance from zoning regulations. Appellees view the matter differently. Were resolution of this dispute left to the courts of Nevada and California differing interpretations of L.U.O. § 7.13 could result. This would impair the effective functioning of the Compact. This is enough to indicate that we have jurisdiction to decide this case.[5]

## IV.

*The Proper Interpretation of L.U.O. § 7.13.*

Section 7.13 of the Land Use Ordinance specifies height limitations for projects in the Tahoe Basin.[6] In this case, as already

---

5. Because this federal question is substantial, pendent jurisdiction supported the district court's treatment of the attack on the procedural aspects of the Douglas County action. We therefore need not decide whether a simple attack on the administrative grant of a local permit-issuing authority under the Ordinance would itself support federal jurisdiction.

6. Section 7.13 of the Ordinance provides, in part:

> No building or other structure erected in any land use district shall have a height greater than that specified below except that the permit-issuing authority, by administrative permit pursuant to 8.33, may authorize a greater height to the extent that the permit-

indicated, the applicable limit is 40 feet. The section provides that local permit-issuing authorities can authorize heights in excess of 40 feet *to the extent* that they determine that four factors have been considered, the final one being that the greater height "will better promote the protection of the environment in the area." It further states that only permits for structures of 45 feet or more are subject to TRPA review. Appellants contend that § 7.13 did not comprehend projects such as appellees'. They argue that the section should be read to establish an absolute height limit, or at least to prohibit the material variations present in "high rise" structures.

■ We begin our analysis with the recognition that "the Compact and the TRPA are *sui generis* offsprings of a marriage between sovereign partners . . . ." *California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d at 218. Section 7.13 cannot be analyzed merely as a traditional zoning ordinance, subject to limited variances. Nor do we think that characterizing the permit as a "special use" permit rather than a "variance" aids the interpretation of L.U.O. § 7.13. Our duty is to interpret the language of the Ordinance in an unstrained manner and in a way that

conforms to the design of the Compact.[7] Focusing initially on the Compact, it is clear that it was not designed to stop economic development in the Tahoe Basin. Article I(c) states that the parties sought to create a "regional plan of resource conservation and *orderly development*." (italics added). The ordinance in question was designed to foster the *orderliness* of development. Does it do so by prohibiting heights significantly in excess of 40 feet? We think not. In the first place, section 7.13 on its face contemplates heights in excess of 45 feet. Projects in excess of that height are subject to TRPA review. Review would not be necessary if such projects were proscribed. It is not possible to state with certainty that 100 to 200 foot heights were contemplated, but nothing in the ordinance explicitly forbids such heights. At the time the Compact was formed and this Ordinance adopted several structures in the Basin were of a height substantially in excess of 40 feet. This strongly suggests that no maximum height was established in the Ordinance so long as the four conditions set out in § 7.13 are met pursuant to proceedings that conform to L.U.O. § 8.33.[8]

■ This court previously has recognized that the Compact is not the powerful anti-

---

issuing authority determines that (1) provision has been made for protection from fire hazards and against aviation accidents; (2) consideration has been given to the protection of view and to the character of the neighborhood; (3) proper provision has been made for light and air; and (4) such greater height will better promote the protection of the environment in the area. Only those administrative permits that allow a building or other structure of a height of 45 feet or more shall be subject to Agency review pursuant to section 4.32. . . .

7. This court previously isolated the task a court must face in approaching the Compact and the Land Use Ordinance:

California makes a critical error in likening the Compact to ordinary zoning legislation and the TRPA to a typical zoning board. In interpreting the provisions of the unique statutory scheme involved here we must look not to Robert's Rules of Order or decisions dealing with tie votes by zoning boards, but instead to the actual language used, as viewed against the backdrop of the Compact's legislative history.
*California ex rel. Younger v. Tahoe Regional Planning Agency,* 516 F.2d at 218.

8. Section 8.33 states:

Administrative permits may be issued for any of the uses or purposes for which such permits are required by the terms of this ordinance. Such permit may be granted only if it is found by the permit-issuing authority that the establishment, maintenance, or operation of the use or purpose in the particular case is not detrimental to health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of such proposed use, or detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the Region, and will not cause any substantial harmful environmental consequences on the land of the applicant or on other lands or waters.

growth measure that some people would wish it to be. *California ex rel. Younger v. Tahoe Regional Planning Agency*, 516 F.2d at 220. The process through which section 7.13 was adopted conformed to that required by the Compact. Had it been intended to prohibit all high rise construction that intention surely could have been expressed more clearly. Although many undoubtedly believe that heights in excess of 40 feet cannot possibly "better promote the protection of the environment," the Ordinance does not incorporate that belief. We therefore reject the appellants' interpretation of section 7.13.[9]

### V.

*Attacks On the Douglas County Permits.*

■ Under the Compact, the TRPA has delegated the initial permit granting function to local authorities. Such action is consistent with the jealous retention of sovereignty by the two parties to the Compact. The Douglas County Commissioners issued these permits, pursuant to authority delegated by the TRPA, after applying standards created by the TRPA. Although the Ordinance does not specify the procedures to be used by local permit-issuing authorities, section 3.00 does define an "Administrative Permit" as "A permit issued by a permit-issuing authority *in accordance with its procedures*." (italics added). The Ordinance thus clearly intended local administrative procedures to apply to the initial issuance. Once issued, § 4.32 subjects these permits to TRPA review, according to the TRPA's own procedures.

### A. Reviewability.

■ Appellants ask us to reach past the TRPA default approval of these projects and to review the validity of the Douglas County permit issuance. Appellees suggest that default approval immunizes Douglas County's issuance from such review. Therefore, we must decide whether under the circumstances of this case the local per-

mit-issuing authority action is subject to review and, if so, under what standards.

We begin by recognizing that this case would present a different question if the TRPA approval was other than by default. In the *Younger* decision, analyzing the "dual majority" requirement of § 4.32, this court stated:

> [T]he TRPA has broad discretion to reject or approve on the merits each building permit request. However, the TRPA's power of de novo review is fully exercised only when a dual majority for or against a proposal is reached.

516 F.2d at 219.

*Younger* characterized a split vote as no "decision." Although the court stated that the decision of the local authority *in effect* stands affirmed, this only described the operational effect of the TRPA's failure to reach a final decision. This failure should not provide the immunity from review that full de novo review and dual majority approval by the TRPA might. *Younger* teaches that under the circumstances of this case TRPA's power of de novo review was not fully exercised. Nothing in the Compact or Ordinance suggests that when that is the case the processes of the permit-issuing authority must be considered as valid whether in conformity with its own rules or not. In the absence of such a provision, the presence of which would be anomalous in any event, we believe the processes employed by Douglas County are subject to judicial review. Therefore, we reject the appellees' contention that default approvals immunize Douglas County's issuance of the permits from judicial review.

### B. Limitations.

We immediately confront an additional problem, however. These actions were filed more than three years after the default approvals. We must decide what limitations period, if any, is applicable. The issue is not a simple one, but we hold that appel-

---

**9.** Appellants make the argument that this Ordinance provision is violated as a matter of law when no trade-off is established between height and land coverage. Because in this case such a trade-off occurred, we do not reach appellants' contention.

lants' attack, to the extent it rests solely on compliance with the procedural requirements applicable to Douglas County's issuance of the permits, is barred by Nevada's limitations provisions.

We recognize that by consenting to the Compact, Congress transformed the agreement of California and Nevada into federal law. *League to Save Lake Tahoe v. Tahoe Regional Agency*, 507 F.2d 517, 523 n.13 (9th Cir. 1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975); *Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353 (9th Cir. 1977), *cert. granted, sub nom. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1978). Moreover, as already indicated, "questions concerning the interpretation and application of TRPA ordinances present federal questions under 1331(a)." *League to Save Lake Tahoe v. B. J. K. Corp.*, 547 F.2d 1072, 1075 (9th Cir. 1976). But by consenting to the Compact, Congress did no more than incorporate the agreement of the two parties into the body of federal law; it did not make applicable to the agreement the entire panoply of *federal* administrative and substantive standards. It cannot be gainsaid that the understanding of Congress about the meaning of the Compact is important; but the actual agreement of the States is certainly no less so. We believe that the proper balance between the respective sovereigns requires that the intention of the two States, acting through the TRPA, govern the meaning of the L.U.O. to the extent that intention is not in conflict with the Compact itself.

To discover this intent the starting point is that TRPA delegated to local permit-issuing authorities the power to issue administrative permits in accordance with their normal procedures. L.U.O. § 3.00. A "Permit-Issuing Authority" is the local government which has the authority and obligation to enforce the Ordinance. Each State establishes the authority of, and manner in which, permit-issuing authorities operate. By delegating initial permit issuing to units of local government, creatures of the laws of the individual states, the TRPA recognized the importance attributed by the two States to retention of their substantially unimpaired sovereignty. The TRPA did not seek to establish one uniform procedural process, rather it established a single standard to be applied by state entities according to their traditional land use determination procedure. The TRPA retained, of course, discretionary power to overturn or modify this decision if it so chose.

An integral part of the procedures through which local authorities grant land use permits is the manner for contesting the local administrative decisions. An important component of this is the period within which challenges to an administrative decision can be brought. This period establishes the finality of local land use decisions and thus is part of the "procedures" by which permits are granted. That period should be applicable in this case. Here we do not confront a direct attack on an action of the TRPA or a call for an interpretation of the substance of the Ordinance, for which a stronger argument for a uniform limitations period exists. By leaving intact the normal local land use planning procedures in the case of default approvals, different practices were necessarily foreseen by the draftsmen of the Ordinance. So long as review of local zoning approvals is not barred altogether or unreasonably restricted by the state review provisions, differences in limitations periods cannot be said to disrupt the effectiveness of the Compact.

Appellants, nonetheless, contend that they assert a federally created right for equitable relief, to which state limitations should not apply. *Holmberg v. Armbrecht*, 327 U.S. 392, 395–98, 66 S.Ct. 582, 90 L.Ed. 743 (1948); *Willis v. Reddin*, 418 F.2d 702 (9th Cir. 1969). That doctrine has no application in this case. Nor can this case be characterized as a federal action seeking the vindication of a public right. *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 366–72, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), *aff'g* 535 F.2d 533, 537 (9th Cir. 1976). Here we sit neither as a court in a

diversity action, applying state law, nor as a court interpreting a purely federal statutory right and borrowing an appropriate state limitations period. Rather we sit to prevent an impairment of the effective functioning of the Compact. As we see it, this functioning is best promoted by adhering closely to both the letter and the spirit of the Compact and Ordinance.

So inclined, we are convinced that the Ordinance defers issues of local permit issuance validity to state determinations.[10] Only when the state determination misinterprets the Compact or the ordinances, or its procedure fails to provide adequate review to assure compliance with the local procedures, should we impose a federal limitations period whether that period be borrowed or cast in the form of laches. The distinction between the position we occupy in this proceeding and that when applying a federal statute is underscored when it is remembered that under the Compact each State reserved the power to withdraw from the Compact at any time without federal approval. Compact, Article VIII(c). The states, California and Nevada, are thus the primary source of our charter. It is consistent with this reality ordinarily to allow state procedures to control.

The district court held that these actions were barred by Nevada Revised Statutes § 278.027.[11] That section requires that an action to review a land use classification or any special use or variance authorized by N.R.S. §§ 278.010 to 278.030, inclusive, must be commenced within 25 days of the filing of final notice of the action. Nevada Revised Statutes § 278.025(1) subordinates the powers of local zoning authorities to those of the TRPA, but provides that such local powers shall be exercised wherever appropriate in furtherance of a plan adopted by the TRPA. Thus, administrative permits issued under the delegated powers of the Land Use Ordinance are authorized by the applicable statutory provisions and subject to the 25-day limitation in N.R.S. § 278.027.

This latter statute was construed in the Nevada state court action which was commenced by the League and filed within the 25-day limitation period. In that action, the Nevada Supreme Court, as indicated above, upheld the trial court's dismissal of the action on the ground that the League had failed to comply with a prerequisite for bringing suit, i. e., that the League had failed to qualify to do business as a corporation prior to filing its complaint. *League to Save Lake Tahoe v. Tahoe Regional Planning Agency*, 563 P.2d 582 (Nev.1977). The court also stated, however, that the League could not refile its suit. The court construed N.R.S. § 278.027 to bar actions commenced more than 25 days *after a permit is "deemed approved" through TRPA inaction.* For the purposes of these proceedings we adopt Nevada's construction of N.R.S. § 278.027. The appellants' challenge of the Douglas County permits in these proceedings are thus barred by N.R.S. § 278.027.[12]

In so holding, we emphasize that effective land use decisions in particu-

---

10. Because whether substantial evidence supported the local determination or whether written findings of the local permit-issuing authority are required also are aspects of the local permit-issuing and challenge process, these are issues of state law and not interpretations of the Ordinance. They can therefore be reviewed only to the extent the state procedures allow review, so long as some opportunity for challenge exists.

11. That section provides:
    278.027 *Judicial relief, review of actions, decisions of governing bodies: Time for commencement.* No action or proceeding shall be commenced for the purpose of seeking judicial relief or review from or with respect to any final action, decision or order of any governing body, commission or board granting or changing any land use classification or granting any special use or variance authorized by N.R.S. §§ 278.010 to 278.030, inclusive, unless such action or proceeding is commenced within 25 days from the date of filing of notice of such final action with the clerk or secretary of such governing body, commission or board.

12. We reject the State of California's argument that limitations are not applicable to it because it is a sovereign. Irrespective of the validity of this argument otherwise, California is not a sovereign to enforce procedural compliance with Nevada local land use planning decisions.

lar must be reliable. Those who go before administrative agencies with development projects after a certain period should be allowed to rely on a decision rendered by the particular agency. Of course a balance must be struck between the convenience of developers on the one hand and, on the other hand, the public interest in assuring that laws enacted to protect land use planning are not circumvented by cursory administrative action that becomes unreviewable before the public becomes informed. N.R.S. § 278.027, as construed by the Nevada Supreme Court, permits no such circumvention. It bars review of administrative permits granted under TRPA standards unless an action is filed within 25 days of the time that the permit is "deemed approved" by TRPA inaction.[13] A permit is "deemed approved" only if the TRPA takes no action within 60 days of submittal to the agency. When a permit receives a default approval, parties concerned with administrative action of a local permit-issuing authority in Nevada thus have 85 days from the public filing of the permit by the local permit granting authority with the TRPA to investigate the existence of a cause of action. This minimum 85-day period from local permit issuance is not so short a period that concerned parties are barred effectively from assuring compliance with proper procedures. The fact that one such party managed to meet the deadline on this case indicates the manageability of this limit.

Therefore, the Douglas County Commissioners' action cannot be challenged because of an alleged deficiency in its administrative discharge. Inasmuch as the permits were thereafter deemed approved by the TRPA and have been found not to violate the substantive terms of the Ordinance, they are valid in all respects.

## VI.

*Federal Common Law Nuisance Claim.*

Finally, we turn to the request by the State of California and the CTRPA that Jennings', Kahle's and Harvey's projects be enjoined on the ground that their development will result in an interstate nuisance. They premise this claim not on any statute, but upon federal common law. The district court dismissed the claim. As we hold that the appellants did not state a claim for common law nuisance under these circumstances, we affirm.

Appellants do not seek to stop an existing activity on the part of appellees that constitutes a nuisance extending across state boundaries. Instead they seek to enjoin a threatened or apprehended nuisance. Before determining whether appellants' action will be such under these circumstances, we must decide whether this common law remedy has been precluded by Congressional action.

Appellees contend that even if an action for federal common law nuisance exists, such action is precluded either by the Compact itself, the Clean Air Act, or the Federal Water Pollution Control Act (FWPCA). When Congress approved the Compact, it appended Article VIII, § 5 to the Compact specifically providing:

> [N]othing contained in this Act or in the compact consented to shall in any way affect . . . the applicability of any law or regulation of the United States in, over, or to the region or waters which are the subject of this compact . . . .

We believe this provision clearly indicates that the Compact itself does not preclude the application of federal common law nuisance doctrines. However, although the Compact does not affect the applicability of federal common law nuisance principles, the

---

13. Appellants also assert that § 278.027 requires the filing of notice of final action with the clerk or secretary of the local permit-issuing authority after the default approval and that no such filing was made with Douglas County in this case. The Nevada Supreme Court, however, construed the statute to preclude actions commenced more than 25 days after an action was "deemed approved." *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 563 P.2d 582 (Nev.1977). The court did not discuss the filing question. By holding as it did, however, the court appears not to require a filing subsequent to the default approval. We adopt this view.

operation of the Compact may influence the factors that should be weighed in applying these principles and doctrines. It is clear, however, that given an appropriate situation, such an action may be maintained.

■ The federal pollution control laws also do not preclude this action. The Clean Air Act and the FWPCA each have "citizen suits" provisions professing not to "restrict any right which any person . . . may have under any statute or common law . . . ." 42 U.S.C. § 7604(e), 33 U.S.C. § 1365(e). This exclusion is even broader than that present in the Compact. Moreover, the Supreme Court held in 1972 that the FWPCA had not yet occupied the field, *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and courts have continued so to hold even after the enactment of the 1972 amendments. *Illinois ex rel. Scott v. City of Milwaukee*, 366 F.Supp. 298 (N.D.Ill.1973); *United States ex rel. Scott v. United States Steel Corp.*, 356 F.Supp. 556, 559 (N.D.Ill.1973); *United States v. Ira S. Bushey & Sons, Inc.*, 346 F.Supp. 145, 149 (D.Vt.1972), *aff'd*, 487 F.2d 1393 (2d Cir. 1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974). *See United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 611 (3d Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). We decline the invitation to draw a different conclusion.

■ The Supreme Court has recognized the validity of federal common law nuisance actions instituted by one state to enjoin damaging activities carried on in another. *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); *Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901). And the

equitable powers of the federal courts are not limited to stopping nuisances already in operation. Long ago the Supreme Court noted that courts of equity "can, not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress . . . ." *Mugler v. Kansas*, 123 U.S. 623, 673, 8 S.Ct. 273, 303, 31 L.Ed. 205 (1887). The exercise of these equitable powers, however, requires great certainty, and the standards for enjoining a threatened nuisance are stricter than those for stopping an existing nuisance.[14]

> [I]t is settled that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence; that if the evidence be conflicting and the injury be doubtful, that conflict and doubt will be a ground for withholding an injunction; and that, where *interposition by injunction is sought, to restrain that which it is apprehended will create a nuisance* . . . the proofs must show such a state of facts as will manifest the danger to be *real and immediate.*

*Missouri v. Illinois*, 180 U.S. at 248, 21 S.Ct. at 346 (emphasis added).

■ Appellants assert that appellees' projects indirectly will create a nuisance—that they will attract more people and cars to the Basin, and that inevitably a nuisance will result. We cannot agree. Appellants' allegation is insufficient to establish that the danger of a nuisance in this case is real and immediate. Without more, appellants at this preliminary stage have not met the requirements set forth in *Missouri v. Illinois, supra.* In so holding we must remember that these projects have passed through

---

**14.** The standard courts have applied to threatened nuisances has been distilled in 58 *Am. Jur.2d* § 147, pp. 724–26:

> [I]t is established that a court of equity may enjoin a threatened or anticipated nuisance, public or private, where it *clearly* appears that a nuisance will *necessarily* result from the contemplated act. . . .
>
> A proposed use of land will not be restrained where it will not *inevitably* constitute a nuisance. If the complainant's right is doubtful, or the thing which it is sought to restrain . . . will not necessarily become a nuisance, but may or may not become such, depending on the use or manner of operation, *or other circumstances*, equity will not interfere.

*Id.* (emphasis added, footnotes omitted), *citing Missouri v. Illinois*, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901).

the gauntlet of approval established by the Compact and the Ordinance.[15] The record before the district court manifests the conflicting evidence as to the degree of potential injury. This court cannot set its face against these facts merely because we as citizens might prefer that all development be barred from the Tahoe Basin. Much of modern life is distasteful, but the federal common law of nuisance bestows upon us no power to root out that which happens to offend both us and a vigorous plaintiff.

Only two previous federal cases have involved threatened nuisances. Neither provides a precedent for what the appellants seek here. In *Missouri v. Illinois, supra,* Missouri brought a direct suit in the Supreme Court to enjoin Illinois and the Sanitary District of Chicago from using a channel built to divert 1,500 tons of untreated sewage a day from Lake Michigan to tributaries which joined the Mississippi River 43 miles above St. Louis. The Court stated that the case involved a bill alleging, in explicit terms, that "damage and irreparable injury would naturally and necessarily be occasioned by acts of the defendants . . .." 180 U.S. at 248, 21 S.Ct. at 346. In this case, no such direct and immediate connection exists. Moreover, by the time the Supreme Court decided the case, the channel had been in operation one year and the real and immediate threat of a nuisance had become a pollutionful reality.

In a more recent case, *Texas v. Pankey,* 441 F.2d 236 (10th Cir. 1971), the Tenth Circuit recognized that a threatened nuisance could be enjoined. It reversed a district court dismissal for lack of jurisdiction of a federal common law nuisance action to enjoin the use, both actual and threatened, of a certain pesticide on lands that drained into a river flowing into Texas. Both the district court and the Tenth Circuit Court initially had denied preliminary injunctions.

By the time the circuit court issued its opinion holding that federal jurisdiction existed, actual spraying had occurred. To avoid the defendant's suggestion that the suit was moot, the court characterized the action as one to enjoin further spraying. The opinion does not discuss the problems that normally attend an effort to enjoin a threatened nuisance.

▮ This case is unique. California entered a Compact, later approved by Congress, to help coordinate and control growth and development in the Tahoe Basin. As equal parties in the interstate agency developed under the Compact, California participated in the adoption of a regional plan and ordinances to regulate new construction in the Basin. Pursuant to established procedures the appellants' projects, which do not violate the ordinances' substantive provisions, have been approved. Now California seeks to prevent construction of these projects by invoking the equitable powers of the federal courts to enjoin interstate nuisances. Fundamentally, it contends the projects will harm the environment of the region. This may be so, but not every injury to the environment is a nuisance under the federal common law. A fortiori, not every threatened injury can be enjoined as a potential nuisance. The line is not a bright one, but we cannot consider high rise hotels and their occupants as indistinguishable from untreated sewage, noxious gases, and poisonous pesticides.

We therefore affirm the judgment of the district court and lift our injunction preventing Harvey's from commencing construction.

AFFIRMED.

---

15. In holding that the Compact approval mechanism affects the viability of an anticipatory federal common law nuisance action, we do not imply that governmental approval of these projects precludes a nuisance action at such time in the future as California can allege that it clearly appears that a nuisance necessarily will result. We hold only that at this time a prospective nuisance cannot necessarily result from this project which does not conflict with the regional plan adopted by both states under the Compact and which has been approved in compliance with the Land Use Ordinance adopted by the TRPA.