The PEOPLE OF the STATE OF CALIFORNIA ex rel. John VAN DE KAMP, Attorney General of the State of California, Plaintiff-Appellee,

v.

The TAHOE REGIONAL PLANNING AGENCY, a Separate Legal Entity Created by Bi-State Compact, Defendant-Appellant.

LEAGUE TO SAVE LAKE TAHOE, a Non-Profit California Corporation, Plaintiff-Appellee,

v.

The TAHOE REGIONAL PLANNING AGENCY, a Separate Legal Entity, and Does 1–100, Defendant-Appellant.

No. 84–2355.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 15, 1985.

Decided July 22, 1985.

ty's opinion whether Charles Minor should be considered a "full-time" employee.

John K. Van de Kamp, Atty. Gen., N. Gregory Taylor, Asst. Atty. Gen., Richard M. Skinner, Dep. Atty. Gen., Sacramento, Cal., for People of State of Cal., et al.

E. Clement Shute, Jr., Shute, Mihaly & Weinberger, San Francisco, Cal., for League to Save Lake Tahoe.

Heaton, Doescher & Owen, Ltd., Gary A. Owen, Carson City, Nev., for Tahoe Regional Planning Agency.

Lawrence L. Hoffman, Hoffman, Lien, Faccinto & Spitzer, Tahoe City, Cal., for Tahoe Sierra Preservation Counsel.

J. Dennis Crab, Tahoe Basin Asso. of Governments, South Lake Tahoe, Cal., for Tahoe Basin Asso. of Governments.

Before ANDERSON and CANBY, Circuit Judges, and NIELSEN *, District Judge.

NIELSEN, District Judge:

The Tahoe Regional Planning Agency appeals from the district court's grant of a preliminary injunction enjoining it from approving any project development or construction in the Lake Tahoe Basin in the absence of its compliance with the Tahoe Regional Planning Compact of 1980. We affirm.

## I. FACTUAL BACKGROUND

### A. *The Tahoe Regional Planning Compacts*

In 1968, the states of California and Nevada entered into an interstate agreement designed to ensure conservation of resources and control of development in the Lake Tahoe Basin. The agreement, known as the Tahoe Regional Planning Compact, became effective when it received the consent of Congress in December 1969. Pub.L. No. 91–148, 83 Stat. 360 (1969).

The 1969 Compact created the Tahoe Regional Planning Agency (TRPA) and charged TRPA with the duty to develop a regional plan for the Tahoe Basin within eighteen months of its formation. TRPA succeeded in adopting a regional plan in December 1971. Various implementing rules, regulations, and ordinances were adopted during the following years.

Apparently, however, the 1969 Compact was "not the powerful anti-growth measure that some people ... wish[ed] it to be," *California Tahoe Regional Planning Agency v. Jennings*, 594 F.2d 181, 188–89 (9th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 86 (1979), and in 1980, California and Nevada extensively amended the Compact. The amended Compact became effective on December 19, 1980, when Congress consented to the changes. Pub.L. No. 96–551, 94 Stat. 3233 (1980).

One of the most significant changes in the Compact is the requirement that TRPA develop and establish "environmental threshold carrying capacities" (ETCC's) for the Lake Tahoe Basin within eighteen months of the amended Compact's effective date. Article I(b); Article V(b).[1] An ETCC is an "environmental standard necessary to maintain a significant scenic, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region." Article II(i). Examples include standards for air quality, water quality, soil conservation, vegetation preservation, and noise. *Id.* Within one year of adoption of the ETCC's, the Compact then requires TRPA to "amend the regional plan so that, at a minimum, the plan and all its elements ... achieves and maintains the adopted environmental threshold carrying capacities." Article V(c).

---

* Honorable Leland C. Nielsen, United States District Judge for the Southern District of California, sitting by designation.

1. All article references are to the 1980 Compact.

Another significant change in the Compact concerns TRPA's authority to approve development projects in the Tahoe region. If an activity undertaken by an individual or a public agency "may substantially affect the land, water, air, space, or any other natural resources of the region," then such activity is a "project" for purposes of regional planning, Article II(h), and must be reviewed and approved by TRPA prior to development and construction. Article VI(b). The 1980 Compact permits TRPA to approve a project only if a detailed environmental impact statement indicates that it complies with the regional plan and any ordinances, rules, and regulations that implement the plan. Article VII; Article VI(b). To ensure this compliance, the Compact requires TRPA to "adopt ordinances prescribing specific written findings that the agency must make prior to approving any project in the region." Article V(g). The Compact instructs TRPA that these findings must "relate to environmental protection and . . . insure that the project under review will not adversely affect implementation of the regional plan and will not cause the adopted environmental threshold carrying capacities of the region to be exceeded." *Id.*

The Compact contemplates a phase-in of these project approval requirements over at least a thirty month time period. As noted earlier, the Compact allowed TRPA eighteen months to develop the ETCC's, and one year thereafter to amend the regional plan. The Compact does not, however, specify a deadline for adoption of the V(g) ordinances. Instead, the Compact provides that until such ordinances are adopted, TRPA "may approve a project in the region only after making written findings . . . that the project is consistent with the regional plan then in effect and with applicable plans, ordinances, regulations and standards of Federal and State agencies relating to the protection, maintenance and enhancement of environmental quality in the region." Article VI(b).

### B. *The Planning Process*

On August 26, 1982, two months later than mandated, TRPA accomplished its first task under the 1980 Compact by adopting Resolution 82–11, which establishes environmental thresholds for water quality, soil conservation, air quality, vegetation preservation, wildlife, fisheries, noise, recreation, and scenic resources. In most instances, TRPA adopted a measurable "numerical standard" as a threshold. For example, the numerical standard for ozone, under air quality, is 0.08 parts per million averaged over one hour. On the other hand, "[i]n certain instances, it was not reasonably possible or feasible to set forth environmental threshold carrying capacities as numerical standards, requiring in such instances that standards be set forth as management standards." Resolution 82–11, ¶ 9. For example, the "management standard" for impervious cover, under soil conservation, requires that "impervious cover . . . comply with the *Land-Capability Classification of the Lake Tahoe Basin, California-Nevada, A Guide for Planning, Bailey, 1974.*" Resolution 82–11, Exhibit A at 3.

Following adoption of the ETCC's, TRPA began working toward its second goal under the 1980 Compact—the adoption of amendments to the regional plan. While we have reviewed the lengthy administrative record recounting the planning process that TRPA placed before the trial court in its opposition to the motion for preliminary injunction, we will not detail it here. Suffice it to say that the extensive public involvement, the numerous Governing Body debates, deliberations, and deadlocks, and the extent of TRPA staff involvement made the process of amending the regional plan an exceedingly complex task. Thus, it is not surprising that in August, 1983, one year after adoption of the ETCC's, it became clear that the plan amendments would not be completed as mandated by Article V(c). Faced with an impossible deadline, and unsure whether it had the authority to approve any project in the region without the amended plan in place as contemplated by the 1980 Compact, TRPA therefore chose to temporarily sus-

pend, for 90 days, further project approvals. Resolution 83–21, August 26, 1983. The suspension in fact remained in effect until the date of adoption of the amendments to the regional plan.

Finally, on April 26, 1984, a full ten months later than mandated by the Compact, TRPA succeeded in adopting amendments to the regional plan by way of Ordinance 84–1. That same day, the State of California filed a lawsuit against TRPA in District Court in Sacramento, seeking declaratory and injunctive relief. In general, California sought to establish that the plan amendments did not comply with Compact requirements and to enjoin TRPA from approving any projects in the Tahoe region under the amended plan. The League to Save Lake Tahoe filed a similar lawsuit the next day, and the two cases were thereafter consolidated.

### C. *The Preliminary Injunction*

On Plaintiffs' motion for a preliminary injunction, the district court found the amended plan contrary to Compact requirements in at least three respects, and thus enjoined TRPA from approving any project in the Lake Tahoe Basin pending trial. Specifically, in reference to certain sections of Ordinance 84–1, the court found that:

1.  the section 3.00 written findings, adopted pursuant to Article V(g) of the Compact, do not in fact comply with that article. Article V(g) requires TRPA to find, with respect to each project, that the project will not cause the established thresholds to be exceeded. Section 3.00 does not require this finding to be made;

2.  sections 4.20 and 4.21 allow approval of certain single family residence construction projects without the making of proper written findings. Approximately 200 homes are exempted even from the deficient section 3.00 findings. All projects must

be subject to proper V(g) findings before they may be approved by TRPA;

3.  eighty-seven of the exempted single family residences, if built, would cause the adopted threshold for impervious cover to be exceeded. No project may cause any adopted threshold to be exceeded.

These are the rulings now presented on appeal.

## II.  DISCUSSION

### A.  *Standard of Review on Appeal*

■ In ruling that Plaintiffs were likely to succeed on the merits of their claims,[2] the district court interpreted the Compact's project approval criteria to require TRPA to adhere to adopted thresholds, and to make the specific written finding that a project will not cause any threshold of the region to be exceeded. *See* Articles V(c) and V(g). A court's interpretation of a statute is a question of law. *Dumdeang v. C.I.R.*, 739 F.2d 452, 453 (9th Cir.1984). Questions of law are reviewed on appeal *de novo*. *Id.* This is true, as well, for questions of law underlying the issuance of a preliminary injunction. *Regents of University of California v. ABC, Inc.*, 747 F.2d 511, 515 (9th Cir.1984); *People of State of California ex rel. Younger v. Tahoe Reg. P. Ag.*, 516 F.2d 215, 217 (9th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97 (1975).

■ In ruling that irreparable harm was likely should an injunction not issue, the district court found that the danger of irreparable harm was the very reason for enactment of the Compact. Mem.Dec. at 7–8. The court also relied on a report prepared by Dr. Charles R. Goldman, and presented to the California Senate Select Committee on Tahoe, for the proposition that the growth rate of planktonic algae in

---

**2.** The district court issued the preliminary injunction based upon its conclusion that Plaintiffs were likely to succeed on the merits of their claims and that irreparable harm was likely should an injunction not issue. This is one of the legal standards that a trial court may utilize in balancing the equities on a motion for preliminary injunction. *Regents of University of California v. ABC, Inc.*, 747 F.2d 511, 515 (9th Cir.1984).

Lake Tahoe is at levels that will lead to loss of the Lake's clarity in only forty more years. C. Goldman, the Eutrophication of Lake Tahoe: A Serious Increase in Algal Growth Accompanied by an Alarming Decline in Transparency, Report to the Senate Select Committee on Tahoe (March 6, 1984). The district court found the report to paint "a very distressing picture." Mem.Dec. at 9. The growth rate of algae is caused by heavy nutrient loading of the Lake due to development of the Tahoe watershed. Developed areas shed runoff waters rapidly and directly to the Lake, with no chance for sediments and nutrients to be removed. A district court's finding of the likelihood of irreparable harm is reviewed for an abuse of discretion. *Regents v. ABC,* 747 F.2d at 515–16.

B. *De Novo Interpretation of the Compact—are Plaintiffs Likely to Succeed on the Merits?*

1. *Scope of Judicial Inquiry into Agency Action*

TRPA is an interstate agency empowered to administer the 1980 Compact by way of ETCC's, an amended regional plan, and ordinances, rules, and regulations. *See, e.g.,* Articles I(b), V(b), V(c), V(g), and VI(a). Necessarily, administration of the Compact requires its interpretation. Challenged before the district court was TRPA's interpretation of Article V(g) of the Compact, as well as its interpretation of the adopted threshold for impervious land cover.

■ Interpretation given a statute by the agency charged with its administration is entitled to deference from the courts, *Thomas v. Peterson,* 753 F.2d 754, 762 (9th Cir.1985), but this deference is not absolute, *Blackfeet Tribe v. State of Montana,* 729 F.2d 1192, 1202 (9th Cir.1984), *aff'd,* — U.S. —, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), and the courts are the final authority on questions of statutory construction. *Alcaraz v. Block,* 746 F.2d 593, 606 (9th Cir.1984); *Livermore v. Heckler,* 743 F.2d 1396, 1404 (9th Cir.1984). Generally this means that the court must review the controlling legislation and the agency's interpretation and determine two things. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. —, —, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

■ First, the court must determine whether the statute unambiguously addresses the question at issue. *Id.* If it does, there is no room for interpretation by either the agency or the court, and the court must rule that the statute's clear directive controls. *Id.* 104 S.Ct. at 2782. On the other hand, if the court determines that the legislation is silent or ambiguous, the question becomes whether the agency's interpretation is a reasonable one, consistent with the statute's overall purpose. *Id.* If it is, then the agency's interpretation controls. *Id.* A court may not supplant reasonable agency regulations with its own. *Id.* These legal principles are incorporated into the Compact. Article VI(j)(5).

2. *Interpretation of Article V(g)*

■ In full, Article V(g) states that:

The agency shall adopt ordinances prescribing specific written findings that the agency must make prior to approving any project in the region. These findings shall relate to environmental protection and shall insure that the project under review will not adversely affect implementation of the regional plan and will not cause the adopted environmental threshold carrying capacities of the region to be exceeded.

Plaintiffs and the district court interpret this provision to require TRPA to draft findings based upon each of the thresholds, to the effect that each project pending approval will not cause any threshold to be exceeded. Mem.Dec. at 6. TRPA, on the other hand, interprets V(g) as not mandating such particularized findings, but only requiring TRPA to draft findings that "insure" that the project under review will not cause the thresholds to be exceeded. Following its interpretation, TRPA adopted a set of fifteen project review findings, which

essentially require that a project be consistent with the amended regional plan. TRPA argues that if a project is consistent with the regional plan, it necessarily will not cause any threshold to be exceeded, because the regional plan itself, by the direction of Article V(c), achieves and maintains the adopted thresholds.

It is this court's duty to determine whether Article V(g) provides a clear directive to TRPA that it must find that each project in the Tahoe region will not cause the adopted environmental thresholds to be exceeded, or whether, instead, V(g) is a more general directive, allowing TRPA the discretion to determine whether such a finding is necessary. We agree with the district court that the mandate of the Compact is clear: no projects can be lawfully approved without written findings that show how each project "will not cause the adopted environmental threshold carrying capacities of the region to be exceeded."

█ This reading of Article V(g) is supported by a reading of the amended Compact as a whole. See: *Matter of Borba*, 736 F.2d 1317, 1320 (9th Cir.1984); *Yamaguchi v. State Farm Mutual Auto. Ins. Co.*, 706 F.2d 940, 948 n. 10 (9th Cir.1983). It is clear that the ultimate goal of the 1980 Compact is the maintenance of minimum environmental standards in the Lake Tahoe Basin, and that TRPA was established "to achieve and maintain [the environmental threshold carrying] capacities while providing opportunities for orderly growth and development *consistent with such capacities.*" Article I(b) (emphasis added). Although it is true that TRPA was required to amend the regional plan to ensure achievement and maintenance of the thresholds, we are not convinced that the Compact framers intended to allow TRPA the discretion to determine that a project need only comply with the various elements of the amended regional plan to merit its approval. Such a reading of Article V(g) renders its entire last clause meaningless, and a statute should not be construed in a way that renders words or phrases superfluous. *Pacific Mut. Life Ins. Co. v. Am.*

*Guar. Life Ins. Co.*, 722 F.2d 1498, 1500 (9th Cir.1984).

### 3. *Exemption of Pending Projects*

█ Section 3.00 of Ordinance 84–1 exempts certain projects from its findings. These projects are set out in sections 4.20(1) and (2) of the Ordinance and consist of single family residences for which permit applications have been completed. These applications were pending as of August 26, 1983, the date that TRPA suspended further project approval pending amendment of the regional plan. Ordinance 84–1 provides that TRPA need make only the findings set forth in section 4.21 before approving such projects. The section 4.21 findings are six in number, and essentially require that the homes comply with original regional plan.

The amended Compact contemplated the continuance of limited residential building in the interim period between its enactment and the adoption of amendments to the regional plan. During the years 1980, 1981, and 1982, the Compact authorized cities and counties within the region to issue building permits for new residential units up to the number each city or county had authorized in 1978. Article VI(c)(3). During the first four months of 1983, that number was reduced to one-third of the number authorized in 1978. *Id.* The Compact did not make issuance of a city or county building permit sufficient for commencement of construction, however. Beginning with the enactment of the amended Compact in December of 1980, all projects within the Tahoe Basin were subject to express project approval criteria, pursuant to Articles V(g) and VI(b). Article VI(b) states that:

Before adoption by the agency of the ordinances required in subdivision (g) of Article V, the agency may approve a project in the region only after making written findings on the basis of substantial evidence in the record that the project is consistent with the regional plan then in effect and with applicable plans, ordinances, regulations, and stan-

dards of Federal and State agencies relating to the protection, maintenance and enhancement of environmental quality in the region.

Nowhere does the Compact authorize TRPA to exempt any project, pending or otherwise, from these VI(b) findings, or from V(g) findings, once the latter have been adopted.

TRPA purported to adopt V(g) findings on April 26, 1984, in section 3.00 of Ordinance 84–1. Thus, as of that date, TRPA could not approve any project in the Tahoe region without the making of these findings. The "findings" in sections 1.28–1.31 of the Ordinance, specially applicable to the single family homes, do not comply with section 3.00. We agree with the district court that TRPA's attempt to exempt the single family residences set out in sections 4.20(1) and (2) of the Ordinance was simply contrary to the clear directive of the Compact.

### 4. Override of the Impervious Land Cover Threshold

■ TRPA established a threshold for all impervious land cover resulting from project development. Designated as a "management standard," TRPA established that:

Impervious cover shall comply with the *Land-Capability Classification of the Lake Tahoe Basin, California-Nevada, A Guide to Planning, Bailey, 1974*

Resolution 82–11, August 26, 1982, Appendix A, at 3.

The "Bailey Report" defines land capability as "the level of use an area can tolerate without sustaining permanent damage through erosion and other causes." The report then establishes seven different land capability classes, ranging from land capable of tolerating a high degree of interference without sustaining permanent damage (class 7) to land that should remain in its natural condition but may be suitable for wildlife, dispersed recreation, or protection of watersheds (class 1). Finally, of importance here, the report recommends a maximum percentage of land in each class that may be subjected to impervious cover, consistent with each class's tolerance for damage. Specifically, the report makes the following recommendations:

| CAPABILITY CLASS | ALLOWABLE PERCENTAGE OF IMPERVIOUS COVER |
|---|---|
| 7 | 30 |
| 6 | 30 |
| 5 | 25 |
| 4 | 20 |
| 3 | 5 |
| 2 | 1 |
| 1 | 1 |

Despite TRPA's designation of the impervious cover threshold as a "management standard," the district court found it to be a "numerical standard," and held that Ordinance 84–1 does not adhere to the Bailey percentages. Mem.Dec. at 6–7. Specifically, the amended plan allows for the building of approximately eighty seven single family residences on land classified in the most sensitive capability classes of 1, 2, and 3. Ordinance 84–1, § 1.28(6). Yet, the Bailey percentages for these classes are 1%, 1%, and 5% respectively. Thus, TRPA's own conclusion that 42,000 metric tons of soil per year will erode from the home sites is not surprising. *See* Ordinance 84–1, § 1.28(7).

In defending the allowance for construction of these homes, TRPA points out that the impervious cover threshold was adopted as a management standard and argues that it does not consist solely of the numerical percentages in the Bailey Report. TRPA further points out that it has determined that the threshold is to be applied on a "watershed association" basis, rather than "parcel-by-parcel." TRPA is indignant that the district court did not defer to its interpretation of this threshold.

We find TRPA's protests unpersuasive. Even if we were to defer to TRPA's interpretation of the impervious cover threshold, nowhere do we find any indication that construction of these homes *will* meet the threshold when applied on a watershed association basis as a management standard. The Compact is clear—the amended plan must achieve and maintain the adopted

thresholds. Article V(c). As it now stands, the amended plan does not meet the adopted threshold for impervious land cover.

### C. *Irreparable Harm*

We have independently reviewed the amended plan, as adopted by TRPA in Ordinance 84–1, for consistency with the 1980 Compact, and agree with the district court that Plaintiffs are likely to succeed on the merits of their claim that the amended plan is contrary to the dictates of the Compact in at least three respects. Plaintiffs who are likely to succeed on the merits of their claims at trial need only further show the likelihood of irreparable harm to merit the award of a preliminary injunction in their favor. *Regents v. ABC.*, 747 F.2d at 515. A finding by a district court of likelihood of irreparable harm is reviewed for an abuse of discretion. *Id.* at 515–16.

In this case, Plaintiffs presented evidence to the district court showing that algal growth in Lake Tahoe is growing at an alarming rate, with the inevitable result forty years down the road of a loss of most of the Lake's clarity. Mem.Dec. at 9–10. The algal growth is due to disturbance of the watershed, including the creation of impervious land coverages and the removal of vegetation caused by construction. *Id.* The district court concluded that, as it stands, the amended plan will only contribute to deterioration of the environmental quality of the region. *Id.* at 10.

We cannot say that the district court's conclusion was an abuse of discretion. As Article I of the amended Compact itself points out, "[t]he waters of Lake Tahoe and other resources of the region are threatened with deterioration or degeneration, which endangers the natural beauty and economic productivity of the region." The Compact was amended to ensure that this deterioration would not continue unchecked. The fact that the amended plan does not comply with the Compact in several respects only lends credence to the district court's conclusion.

### III. CONCLUSION

In sum, after a complete review of the record in this case, we agree with the district court that Plaintiffs are likely to succeed on the merits of their claim that the amended plan is contrary to the 1980 Compact in several respects. Further, the district court did not abuse its discretion in finding that there is a likelihood of irreparable harm to the waters of Lake Tahoe and other resources of the region should an injunction not issue.

The preliminary injunction is AFFIRMED.